1  MICHAEL J. STORTZ (SBN #139386)
   michael.stortz@dbr.com
2  BETH O. ARNESE (SBN #241186)
   beth.arnese@dbr.com
3  DRINKER BIDDLE & REATH LLP
   50 Fremont Street, 20th Floor
4  San Francisco, CA  94105-2235
   Telephone:     (415) 591-7500
5  Facsimile:     (415) 591-7510

6  STEVEN A. ZALESIN (admitted *pro hac vice*)
   sazalesin@pbwt.com
7  TRAVIS J. TU (admitted *pro hac vice*)
   tjtu@pbwt.com
8  JONAH M. KNOBLER (admitted *pro hac vice*)
   jknobler@pbwt.com
9  PATTERSON BELKNAP WEBB & TYLER LLP
   1133 Avenue of the Americas
10 New York, NY 10036
   Telephone:     (212) 336-2000
11 Facsimile:     (212) 336-2222

12 Attorneys for Defendants
   JOHNSON & JOHNSON and McNEIL
13 NUTRITIONALS, LLC

14

15                 UNITED STATES DISTRICT COURT

16                 NORTHERN DISTRICT OF CALIFORNIA

17

18 BARBARA BRONSON, MICHAEL          Case No. 3:12-cv-04184-CRB
   FISHMAN, and ALVIN KUPPERMAN on
19 behalf of themselves and all others   **NOTICE OF MOTION AND MOTION TO**
   similarly situated,                   **DISMISS PURSUANT TO FEDERAL**
                                         **RULE OF CIVIL PROCEDURE 12(b)(6);**
20            Plaintiffs,                **MEMORANDUM OF POINTS AND**
                                         **AUTHORITIES IN SUPPORT OF**
21 v.                                    **MOTION TO DISMISS**

22 JOHNSON & JOHNSON and McNEIL       Date:      February 8, 2013
   NUTRITIONALS, LLC,                 Time:      10:00 a.m.
23                                    Dept:      6
             Defendants.             Judge:     Hon. Charles R. Breyer
24
                                     Complaint Filed:   August 9, 2012
25                                   Trial Date:  None Set

26

27

28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................ 2

BACKGROUND ........................................................................................................ 3

    A.    The Products .............................................................................................. 3

    B.    Plaintiffs' Allegations ............................................................................... 4

        1.    The "Splenda Essentials" Name ................................................. 4

        2.    The Fiber Product ....................................................................... 4

        3.    The Antioxidants Product ........................................................... 5

        4.    The B Vitamins Product .............................................................. 6

        5.    Websites And Advertising .......................................................... 7

    C.    Statutory And Regulatory Framework ..................................................... 8

ARGUMENT ........................................................................................................... 11

I.    Plaintiffs' Claims Are All Preempted By Federal Law ................................. 12

    A.    The Fiber Product .................................................................................. 13

    B.    The Antioxidants Product ...................................................................... 15

    C.    The B Vitamins Product ......................................................................... 18

        1.    FDA's Regulation Of Structure/Function Claims ..................... 19

        2.    McNeil's Structure/Function Claim Is Permitted By Federal Law .......... 21

        3.    Plaintiffs' Claims Regarding The B Vitamins Product Are Preempted ........ 23

II.    Plaintiffs' Claims Are Barred By The Safe Harbor Doctrine ........................... 24

III.    The FAC Fails To State A Viable Claim For Relief Under California Law ................ 26

    A.    McNeil's Labeling Is Truthful And Not Misleading As A Matter Of Law ......... 26

        1.    The "Splenda Essentials" Name ............................................... 27

        2.    The Antioxidants Product ......................................................... 28

        3.    The Fiber Product ..................................................................... 29

        4.    The B Vitamins Product ............................................................ 30

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION & MOTION TO DISMISS
PURSUANT TO FRCP12(B)(6)    - i -    CASE NO. 3:12-cv-04184-CRB

1

**TABLE OF CONTENTS**
**(continued)**

2

Page

3      B.      Lack Of Scientific Substantiation Does Not Constitute False Advertising .......... 30

4      C.      Plaintiffs' Claims Concerning McNeil's Non-Label Advertising Are
              Legally Barred And Factually Deficient ................................................................. 32

5      D.      Plaintiffs' Implied Warranty Of Merchantability And Unjust Enrichment
              Claims Are Not Legally Viable .............................................................................. 33

6

7   CONCLUSION ........................................................................................................................ 35

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION & MOTION TO DISMISS
PURSUANT TO FRCP12(B)(6)                    - ii -                    CASE NO. 3:12-cv-04184-CRB

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

CASES

*Alvarez v. Chevron Corp.*,
    656 F.3d 925 (9th Cir. 2011) .................................................................................. 25

*Am. Health Prods. Co. v. Hayes*,
    574 F. Supp. 1498 (S.D.N.Y. 1983),
    *aff'd* 744 F.2d 912 (2d Cir. 1984) ....................................................................... 19, 20

*Am. Home Prods. Corp. v. Johnson & Johnson*,
    672 F. Supp. 135 (S.D.N.Y. 1987) ...................................................................... 18, 25

*Andrus v. AgrEvo USA Co.*,
    178 F.3d 395 (5th Cir. 1999) ................................................................................. 32

*Arizona v. United States*,
    132 S. Ct. 2492 (2012) ........................................................................................... 23

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .......................................................................................... 11, 12

*Aurora Dairy Corp. Organic Milk Mktg. & Sales Practices Litig.*,
    621 F.3d 781 (8th Cir. 2010) ................................................................................. 24

*Baltazar v. Apple, Inc.*,
    2011 U.S. Dist. LEXIS 96140 (N.D. Cal. Aug. 26, 2011) .................................... 26

*Berenblat v. Apple, Inc.*,
    2009 U.S. Dist. LEXIS 80734 (N.D. Cal. Aug. 21, 2009) .................................... 34

*Birdsong v. Apple, Inc.*,
    590 F.3d 955 (9th Cir. 2009) ................................................................................. 33

*Bober v. Glaxo Wellcome, PLC*,
    1999 U.S. Dist. LEXIS 14724 (N.D. Ill. Sept. 3, 1999) ....................................... 32

*Briseno v. Conagra Foods, Inc.*,
    2011 U.S. Dist. LEXIS 154750 (C.D. Cal. Nov. 23, 2011) .......................... 9, 11, 33

*Carrea v. Dreyer's Grand Ice Cream, Inc.*,
    2011 U.S. Dist. LEXIS 6371 (N.D. Cal. Jan. 10, 2011),
    *aff'd*, 2012 U.S. App. LEXIS 6851 (9th Cir. Apr. 5, 2012) ............................. 13, 26

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
    20 Cal. 4th 163 (1999) ........................................................................................... 25

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION & MOTION TO DISMISS
PURSUANT TO FRCP12(B)(6)      - iii -       CASE NO. 3:12-cv-04184-CRB

*Chacanaca v. Quaker Oats Co.*,
   752 F. Supp. 2d 1111 (N.D. Cal. 2010) ............................................................ 12, 13

*Chavez v. Nestle USA, Inc.*,
   2011 U.S. Dist. LEXIS 58733 (C.D. Cal. May 2, 2011) ...................................... 31

*Chavez v. Nestle USA, Inc.*,
   2011 U.S. Dist. LEXIS 9773 (C.D. Cal. Jan. 10, 2011) ........................................ 33

*Davis v. HSBC Bank*,
   691 F.3d 1152 (9th Cir. 2012) ............................................................... 25, 26, 29

*Degelmann v. Advanced Med. Optics, Inc.*,
   659 F.3d 835 (9th Cir. 2011) ...................................................................... 12, 19

*Dvora v. Gen. Mills, Inc.*,
   2011 U.S. Dist. LEXIS 55513 (C.D. Cal. May 16, 2011) ........................... 13, 26, 33

*In re Facebook, Inc., PPC Ad. Litig.*,
   282 F.R.D. 446 (N.D. Cal. 2012) ................................................................... 33

*Farina v. Nokia, Inc.*,
   625 F.3d 97 (3d Cir. 2010),
   *cert. denied*, 132 S. Ct. 365 (2011) ............................................................... 24

*Fidelity Fed. Savings & Loan Ass'n v. De la Cuesta*,
   458 U.S. 141 (1982) .................................................................................. 13

*Fletcher v. Celsius Holdings, Inc.*,
   No. BC439 055 (Cal. Sup. Ct. Los Angeles Cnty. Sept. 1, 2012) ......................... 30

*Fraker v. Bayer Corp.*,
   2009 U.S. Dist. LEXIS 125633 (E.D. Cal. Oct. 2, 2009) ................................... 31

*Free v. Bland*,
   369 U.S. 663 (1962) .................................................................................. 12

*Freeman v. Time, Inc.*,
   68 F.3d 285 (9th Cir. 1995) ........................................................................ 26

*Gibbons v. Ogden*,
   22 U.S. 1, 9 Wheat. 1 (1824) ..................................................................... 12

*Green v. McNeil Nutritionals, LLC*,
   2005 WL 3388158 (Fla. Cir. Ct. Nov. 16, 2005) ............................................. 3, 28

*Hansen Beverage Co. v. Innovation Ventures, LLC*,
   2009 U.S. Dist. LEXIS 127605 (S.D. Cal. Dec. 22, 2009) .................................. 7

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION & MOTION TO DISMISS
PURSUANT TO FRCP12(B)(6)    - iv -    CASE NO. 3:12-CV-04184-CRB

*Hao v. New Century Mortg. Corp.*,
    2012 U.S. Dist. LEXIS 97787 (N.D. Cal. July 13, 2012) (Breyer, J.) ................................ 11

*Harlan v. Roadtrek Motorhomes, Inc.*,
    2009 U.S. Dist. LEXIS 29169 (S.D. Cal. Apr. 2, 2009) ........................................ 34

*Haskell v. Time, Inc.*,
    857 F. Supp. 1392 (E.D. Cal. 1994) ........................................ 26

*Hauter v. Zogarts*,
    14 Cal. 3d 104 (Cal. 1975) ........................................ 34

*Hill v. Roll Int'l Corp.*,
    195 Cal. App. 4th 1295 (2011) ........................................ 26

*Jogani v. Superior Court*,
    165 Cal. App. 4th 901 (2008) ........................................ 34

*Kearns v. Ford Motor Co.*,
    567 F.3d 1120 (9th Cir. 2003) ........................................ 11

*Kent v. Hewlett-Packard Co.*,
    2010 WL 2681767 (N.D. Cal. July 6, 2010) ........................................ 33

*Kordel v. United States*,
    335 U.S. 345 (1948) ........................................ 32

*Lam v. Gen Mills, Inc.*,
    2012 U.S. Dist. LEXIS 65815 (N.D. Cal. May 10, 2012) ........................................ 13

*Lopez v. Nissan N. Am., Inc.*,
    201 Cal. App. 4th 572 (2011) ........................................ 25

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012) ........................................ 33

*McKinney v. Google, Inc.*,
    2011 U.S. Dist. LEXIS 97958 (N.D. Cal. Aug. 30, 2011) ........................................ 27

*McKinniss v. Gen. Mills, Inc.*,
    2007 U.S. Dist. LEXIS 96107 (C.D. Cal. Sept. 18, 2007) ........................................ 26, 27, 28

*McKinniss v. Sunny Delight Beverages Co.*,
    2007 U.S. Dist. LEXIS 96108 (C.D. Cal. Sept. 4, 2007) ........................................ 4, 11, 27, 28

*McNeil-PPC, Inc. v. Merisant Co.*,
    2004 WL 3316380 (D.P.R. July 29, 2004) ........................................ 29, 30

*Meaunrit v. Pinnacle Foods Group, LLC*,
    2010 U.S. Dist. LEXIS 43858 (N.D. Cal. May 5, 2010) ........................................ 12

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION & MOTION TO DISMISS
PURSUANT TO FRCP12(B)(6)                    - v -                    CASE NO. 3:12-cv-04184-CRB

*Metrophones Telecomm., Inc. v. Global Crossing Telecomm., Inc.*,
    423 F.3d 1056 (9th Cir. 2005).................................................................. 23, 24

*Mills v. Giant of Md., LLC*,
    441 F. Supp. 2d 104 (D.D.C. 2006) ........................................................ 10

*N.J. Citizen Action v. Schering-Plough Corp.*,
    842 A.2d 174 (N.J. App. Div. 2003) ........................................................ 32

*Nat'l Council Against Health Fraud, Inc. v. King Bio Pharms., Inc.*,
    107 Cal. App. 4th 1336 (2003) ................................................................. 31

*Peviani v. Hostess Brands, Inc.*,
    750 F. Supp. 2d 1111 (C.D. Cal. 2010) .............................................. 8, 9, 12

*PhotoMedex, Inc. v. Irwin*,
    601 F.3d 919 (9th Cir. 2010)................................................................... 25

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.*,
    227 F.3d 489 (5th Cir. 2000).................................................................... 27

*Pom Wonderful LLC v. Coca-Cola Co.*,
    679 F.3d 1170 (9th Cir. 2012).................................................................. 12

*Prohias v. AstraZeneca Pharms., L.P.*,
    958 So. 2d 1054 (Fla. Ct. App. 2007) ..................................................... 32

*Rosen v. Unilever U.S., Inc.*,
    2010 U.S. Dist. LEXIS 43797 (N.D. Cal. May 3, 2010) ........................ 26

*Sanders v. Apple, Inc.*,
    672 F. Supp. 2d 978 (N.D. Cal. 2009) .................................................... 27

*Scheuerman v. Nestle Healthcare Nutrition*,
    2012 U.S. Dist. LEXIS 99397 (D.N.J. July 17, 2012) ............................ 31

*Smith v. Ford Motor Co.*,
    462 F. App'x 660 (9th Cir. 2011) ............................................................ 34

*Southland Sod Farms v. Stover Seed Co.*,
    108 F.3d 1134 (9th Cir. 1997).................................................................. 27

*Sprewell v. Golden State Warriors*,
    266 F.3d 979 (9th Cir. 2001).................................................................... 11

*Stanley v. Bayer Healthcare LLC*,
    2012 U.S. Dist. LEXIS 47895 (S.D. Cal. Apr. 3, 2012) ......................... 31

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION & MOTION TO DISMISS
PURSUANT TO FRCP12(B)(6)
- vi -
CASE NO. 3:12-cv-04184-CRB

*Turek v. Gen. Mills, Inc.*,
754 F. Supp. 2d 956 (N.D. Ill. 2010),
*aff'd*, 662 F.3d 423 (7th Cir. 2011) ........................................................ *passim*

*United States ex rel. Dingle v. BioPort Corp.*,
270 F. Supp. 2d 968 (W.D. Mich. 2003),
*aff'd*, 388 F.3d 209 (6th Cir. 2004) ...................................................... 7

*Videtto v. Kellogg USA*,
2009 U.S. Dist. LEXIS 43114 (E.D. Cal. May 21, 2009) ................................ 27, 28

*Werbel v. Pepsico, Inc.*,
2010 U.S. Dist. LEXIS 76289 (N.D. Cal. July 1, 2010) ...................................... 26

*Whiting v. AARP*,
701 F. Supp. 2d 21 (D.D.C. 2010) ...................................................................... 27

*Williams v. Gerber Prods. Co.*,
552 F.3d 934 (9th Cir. 2008)............................................................................ 26

## CONSTITUTIONAL PROVISIONS, STATUTES, RULES & REGULATIONS

21 C.F.R. § 100.1 ........................................................................................ 10, 12

21 C.F.R. § 101.9 .................................................................................. 16, 17, 27

21 C.F.R. § 101.54 ............................................................................... 14, 15, 16

21 C.F.R. § 101.76 ...................................................................................... 14

21 C.F.R. § 101.93 .............................................................................. 19, 20, 21

21 U.S.C. § 321 ........................................................................................ 19, 32

21 U.S.C. § 341 ............................................................................................. 8

21 U.S.C. § 343 ..................................................................................... *passim*

21 U.S.C. § 343-1 .................................................................................. *passim*

21 U.S.C. § 371 ............................................................................................. 8

Cal. Bus. & Prof. Code § 17200 ..................................................................... 1, 8

Cal. Bus. & Prof. Code § 17500 ..................................................................... 1, 8

Cal. Civ. Code. § 1750 .................................................................................. 1, 8

Cal. Com. Code § 2314 ............................................................................... 33, 34

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION & MOTION TO DISMISS
PURSUANT TO FRCP12(B)(6)                    - vii -                    CASE NO. 3:12-cv-04184-CRB

Dietary Supplement Health and Education Act of 1994, Pub. L. No. 103-417, 108 Stat. 4325 (1994) .................................................................................................. 9, 20, 21, 23

Federal Rule of Civil Procedure 9(b) .................................................................. 11, 33

Federal Rule of Civil Procedure 12(b)(6) ............................................................. 1, 2

*Food Labeling: Mandatory Status of Nutrition Labeling and Nutrient Content Revision, Format for Nutrition Label*, 68 Fed. Reg. 2079, 2108 (Jan. 6, 1993)..................................... 16

*Food Labeling: Nutrient Content Claims, Definition of Term: Healthy*, 59 Fed. Reg. 24232, 24243 (May 10, 1994)......................................................................... 27

*Food Labeling: Requirements for Nutrient Content Claims, Health Claims, and Statements of Nutritional Support for Dietary supplements*, 62 Fed. Reg. 49859, 49861 (Sept. 23, 1997).............................................................................................. 21

*Food Labeling: Revision of Reference Values and Mandatory Nutrients*, 72 Fed. Reg. 62149 (Nov. 2, 2007) ................................................................................... 15

*Food Labeling; Nutrient Content Claims: Definition for "High Potency" and Definition of "Antioxidant" for Use in Nutrient Content Claims for Dietary Supplements and Conventional Foods*, 62 Fed. Reg. 49868, 49872-73 (Sept. 23, 1997) (codified at 21 C.F.R. § 101.54(g) ...................................................................................... 16

*Food Labeling; Reference Daily Intakes and Daily Reference Values*, 58 Fed. Reg. 2206 (Jan. 6, 1993)................................................................................................... 16

*Foods Being Marketed as "Functional Foods,"* 71 Fed. Reg. 62400, 62402-03 (Oct. 25, 2006) ........................................................................................................... 11

*Nutrient Content Claims: Definition for "Antioxidant,"* 62 Fed. Reg. 49868, 49873 (Sept. 23, 1997) ...................................................................................................... 16

*Nutrition Labeling and Ingredient Labeling of Dietary Supplements*, 62 Fed. Reg. 49826, 49836 (Sept. 23, 1997)............................................................................... 17

*Public Health Messages on Food Labels and Labeling*, 52 Fed. Reg. 28843, 28845 (Aug. 4, 1987) ........................................................................................................... 8

*Regulations for the Enforcement of the FDCA*, 38 Fed. Reg. 2125, 2128 (Jan. 19, 1973).......... 17

*Regulations for Enforcement of the FDCA*, 38 Fed. Reg. 2125, 2128 (Jan. 19, 1973)................. 17

*Regulations for the Enforcement of the FDCA*, 38 Fed. Reg. 6951, 6958 (Mar. 14, 1973) ........ 17

*Regulations on Statements Made for Dietary Supplements*, 63 Fed. Reg. 23624, 23624 (Apr. 29, 1998).............................................................................................. 20

*State Petitions Requesting Exemption from Federal Preemption*, 58 Fed. Reg. 2462, 2462
(Jan. 6, 1993).................................................................................................................. 10

U.S. Const. Article VI cl. 2........................................................................................... 12

**Legislative History**

136 Cong. Rec. H5836 (daily ed. July 30, 1990)............................................................ 9

136 Cong. Rec. S16607 (daily ed. Oct. 24, 1990) ................................................... 9, 23

Conference Report on Dietary Supplement Health and Education Act of 1994 S. Rep. 410
(Oct. 8, 1994) ................................................................................................ 19, 20, 21

H.R. Rep. No. 101-538 (1990)........................................................................................ 9

**Food and Drug Administration Documents**

FDA, *Claims That Can Be Made for Conventional Foods and Dietary Supplements*, Sept.
2003, http://www.fda.gov/food/labelingnutrition/labelclaims/ucm111447.htm ...................... 6

FDA, *Dietary Supplements - Import and Domestic*, Attachment B,
http://www.fda.gov/Food/GuidanceComplianceRegulatoryInformation/ComplianceEn
forcement/ucm071547.htm ............................................................................................ 27

FDA, *Fortify Your Knowledge About Vitamins*,
http://www.fda.gov/ForConsumers/ConsumerUpdates/ucm118079.htm............................... 27

FDA, *Guidance for Industry and FDA: Dear Manufacturer Letter Regarding Food
Labeling*, Jan. 2007, http://www.fda.gov/Food/
GuidanceComplianceRegulatoryInformation/GuidanceDocuments/FoodLabelingNutri
tion/ucm053425.htm .................................................................................................... 19

FDA, *Structure/Function Claims*, http://www.fda.gov/Food/LabelingNutrition/
LabelClaims/StructureFunctionClaims/default.htm ...................................................... 21

FDA, Warning Letter to Hill's Pet Nutrition, Inc., Nov. 23, 2011,
http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2011/
ucm281270.htm............................................................................................................ 19

**Other Authorities**

CSPI, *Aspartame: New Study Renews Cancer Concern, Says CSPI*,
July 27, 2005, http://www.cspinet.org/new/200507272.html ................................... 3

CSPI, *Candy Scam*,
Nutrition Action Healthletter, March 2006,
http://www.cspinet.org/nah/03_06/rsvfp_can.pdf ................................................... 15

Drinker Biddle &
Reath LLP
Attorneys At Law
San Francisco

Notice of Motion & Motion to Dismiss
Pursuant to FRCP12(B)(6)                    - ix -                    Case No. 3:12-cv-04184-CRB

CSPI, *Chemical Cuisine: A Guide to Food Additives*,
    Nutrition Action Healthletter, May 2008, at 7,
    http://www.cspinet.org/nah/05_08/chem_cuisine_can.pdf ..................................... 3

CSPI, *Food Label Makeovers Proposed by CSPI*,
    Dec. 7, 2009, http://www.cspinet.org/new/200912071_print.html .......................... 15

CSPI, *Food Labeling Chaos: The Case for Reform* (2010),
    http://www.cspinet.org/new/pdf/food_labeling_chaos_report.pdf ......................... 15

CSPI, *H2NO: The Scoop on Enhanced Waters*, Nutrition Action Healthletter, June 2008,
    at 1, http://www.cspinet.org/nah/06_08/h2no.pdf

CSPI, *Learn About Food Additives: Pyroxidine*,
    http://www.cspinet.org/reports/chemcuisine.htm#pyridoxine ........................... 7, 22

CSPI, *Sweet Nothings: Not All Sweeteners Are Equal*,
    Nutrition Action Healthletter, May 2004, at 1,
    http://www.cspinet.org/nah/05_04/sweet_nothings.pdf ......................................... 3

Henry C. Lukaski, Ph.D., *Vitamin and Mineral Status: Effects on Physical Performance* at
    633, http://naldc.nal.usda.gov/download/42756/PDF ........................................... 22

Institute of Medicine, *Dietary Reference Intakes for Thiamin, Riboflavin, Niacin, Vitamin
    B6, Folate, Vitamin B12, Pantothenic Acid, Biotin, and Choline* (1998),
    https://download.nap.edu/catalog.php?record_id=6015 ......................................... 22

Institute of Medicine, *Food and Nutrition Board, Dietary Reference Intakes for Vitamin
    C, Vitamin E, Selenium, and Carotenoids* (2000) ................................................ 17

Peter Barton Hutt, *A Brief History of FDA Regulation Relating to the Nutrient Content of
    Food* at 10-11 ............................................................................................. 9, 10, 11

Peter Barton Hutt, *Government Regulation of Health Claims in Food Labeling and
    Advertising*, 41 Food Drug Cosm. L.J. 3, 27-34, 42-49 (1986) ......................... 8, 32

Ralph Shapiro, ed., NUTRITIONAL LABELING HANDBOOK (1995) ................................... 9

Richard M. Cooper, et al., *History of Health Claims Regulation*, 45 Food Drug Cosm. L.J.
    (1990) ............................................................................................................ 8, 9

Splenda Store, http://www.splendastore.com/category/getsplenda/packets.do?nType=2 .......... 29

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION & MOTION TO DISMISS
PURSUANT TO FRCP12(B)(6)                     - x -                     CASE NO. 3:12-cv-04184-CRB

1

## NOTICE OF MOTION TO DISMISS

2

TO PLAINTIFFS AND THEIR COUNSEL OF RECORD:

3

PLEASE TAKE NOTICE THAT on February 8, 2013, at 10:00 a.m. before the Honorable

4

Charles R. Breyer, at 450 Golden Gate Avenue, Courtroom 6, San Francisco, California,

5

Defendants Johnson & Johnson and McNeil Nutritionals, LLC (collectively "McNeil") will and

6

hereby do move to dismiss the following causes of action contained in the First Amended Class

7

Action Complaint ("FAC") of Plaintiffs Barbara Bronson, Michael Fishman and Alvin

8

Kupperman (collectively "Plaintiffs"):  (1)  California's Unfair Competition Law ("UCL"), Bus.

9

& Prof. Code §17200 – unlawful business acts and practices; (2) UCL, Bus. & Prof. Code §17200

10

– unfair business acts and practices; (3) UCL, Bus. & Prof. Code §17200 – fraudulent business

11

acts and practices; (4) California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code

12

§17500 – misleading and deceptive advertising; (5) FAL, Cal. Bus. & Prof. Code §17500 – untrue

13

advertising; (6) California's Consumer Legal Remedies Act ("CLRA"), Civ. Code. §1750; (7)

14

Unjust Enrichment; (8) Breach of Implied Warranty of Merchantability.

15

McNeil bases its Motion to Dismiss on the following grounds:  Dismissal of the FAC in

16

its entirety is warranted pursuant to Fed. R. Civ. P. 8(a) and 12(b)(6) because Plaintiffs fail to

17

state any claim upon which relief can be granted.  The Federal Food, Drug and Cosmetic Act

18

("FDCA") preempt Plaintiffs' claims.  In addition, because McNeil's labeling practices are

19

permitted by FDA rules, Plaintiffs' claims are barred by California's "safe harbor" doctrine,

20

which precludes liability for conduct affirmatively condoned by governmental authorities.  In

21

addition, plaintiffs' claims are based on nonactionable puffery.  Moreover, Plaintiffs' allegations

22

that there is an "absence of reliable scientific evidence" relates to a liability theory not recognized

23

under California law.  Plaintiffs also fail to allege Rules 8(a) and in accordance with 9(b) that

24

they saw or relied upon any of the non-label advertising at issue. Plaintiffs' implied warranty

25

claim fails because the FAC's allegations do not plausibly establish that the products at issue

26

were nonmerchantable.  Plaintiffs' unjust enrichment claim fails because unjust enrichment is not

27

an independent cause of action in California.

28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION & MOTION TO DISMISS
PURSUANT TO FRCP12(B)(6)                    - 1 -                    CASE NO. 3:12-cv-04184-CRB

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants Johnson & Johnson and McNeil Nutritionals, LLC (collectively "McNeil") respectfully submit this memorandum in support of their motion, pursuant to Federal Rules of Civil Procedure 8(a), (b) and 12(b)(6), to dismiss the First Amended Class Action Complaint of Plaintiffs Barbara Bronson, Michael Fishman and Alvin Kupperman (collectively "Plaintiffs").

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs allege that the labeling and advertising for Splenda® Essentials™ no-calorie sweeteners (the "Products") include misleading statements about the Products' vitamins and nutrients that violate California law.  For three independent reasons, Plaintiffs' claims lack merit and must be dismissed with prejudice.

First, Plaintiffs' claims are squarely preempted by federal law.  The Federal Food, Drug and Cosmetic Act ("FDCA") and implementing regulations promulgated by the United States Food and Drug Administration ("FDA") extensively regulate the statements that may be made on labels for food products.  The FDCA, moreover, expressly preempts state-law requirements that are "not identical to" federal law.  Here, Plaintiffs' state-law claims indisputably seek to impose labeling obligations "not identical to" federal requirements.  In fact, FDA regulations e*xpressly permit* all of the statements that Plaintiffs dispute.

Second, because McNeil's labeling practices are clearly permitted by FDA rules, Plaintiffs' claims are barred by California's "safe harbor" doctrine, which precludes liability for conduct affirmatively condoned by governmental authorities.

Third, even if their claims were not preempted and did not invade the safe harbor that insulates them from attack, Plaintiffs' allegations fail to state a viable claim under California law.  Plaintiffs allege that the name Splenda "Essentials" implies that the Products are "*necessary*" for human health, and that various statements about the Products' nutrients lead consumers to think they can derive miraculous health benefits — such as warding off heart disease or preventing cancer — simply by using the Products.  The Splenda Essentials name, however, is classic non-actionable puffery, and the notion that the Products' labels imply the panoply of health-related messages alleged by Plaintiffs is manifestly unreasonable as a matter of law.  Moreover, Plaintiffs

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION & MOTION TO DISMISS
PURSUANT TO FRCP12(B)(6)                - 2 -                CASE NO. 3:12-cv-04184-CRB

do not allege that these purportedly implied messages are *false*, but rather that there is an "*absence of reliable scientific evidence*" to support them — a liability theory not recognized under California law.  And none of the Plaintiffs alleges that she so much as saw, let alone relied upon, any of the non-label advertising for the Products.

For these and other reasons set forth below, Plaintiffs' claims must be dismissed.

## BACKGROUND

### A.    The Products

McNeil markets and sells Splenda brand no-calorie sweeteners, which are sweetened with sucralose.  (First Amended Complaint ("FAC") ¶¶ 1, 13.)  Sucralose was approved by FDA in 1998, and Plaintiffs' co-counsel, the Center for Science in the Public Interest ("CSPI"), describes it as "the safest" no-calorie sweetener on the market.[1]  Splenda was introduced for sale in 2000, and it quickly became the best-selling brand of no-calorie sweeteners in the United States.  *See Green v. McNeil Nutritionals, LLC*, 2005 WL 3388158, at *2 (Fla. Cir. Ct. Nov. 16, 2005).[2]

In 2008, McNeil introduced a new Splenda product that contains one gram of fiber in each packet (the "Fiber Product").  In 2011, McNeil rebranded the Fiber Product under the Splenda Essentials name and introduced two additional Splenda Essentials products:  Splenda Essentials with Antioxidants ("the Antioxidants Product"), which contains 20% of the recommended daily intake ("RDI") of antioxidant vitamins C and E in each packet, and Splenda Essentials with B Vitamins (the "B Vitamins Product"), which contains 20% of the RDI of vitamins $B_1$, $B_5$, and $B_6$ in each packet.  All three Products — the Fiber Product, the Antioxidants Product, and the B Vitamins Product — enable consumers to sweeten foods without adding calories, while providing a stated amount of identified nutrients.

---

[1] *See* CSPI, *Chemical Cuisine: A Guide to Food Additives*, Nutrition Action Healthletter, May 2008, at 7, http://www.cspinet.org/nah/05_08/chem_cuisine_can.pdf; CSPI, *Sweet Nothings: Not All Sweeteners Are Equal*, Nutrition Action Healthletter, May 2004, at 1, http://www.cspinet.org/nah/05_04/sweet_nothings.pdf; CSPI, *Aspartame: New Study Renews Cancer Concern, Says CSPI*, July 27, 2005, http://www.cspinet.org/new/200507272.html.

[2] In *Green*, a Florida court denied the plaintiff consumer's motion to certify a putative class action challenging McNeil's marketing and advertising of Splenda.  *See Green*, 2005 WL 3388158, at *10.

**B.      Plaintiffs' Allegations**

Plaintiffs are California residents who allege that they "collectively purchased" the Products at California grocery stores.  (FAC ¶ 8.)  Plaintiffs Fishman and Kupperman allege that they used roughly ten packets of the Products each day "to sweeten foods like coffee, yogurt, and cereal."  (*Id.*)  Plaintiff Bronson alleges that she "used [the Products] for her morning coffee and also provided [them] to the clients in her [hair] salon."  (*Id.*)

Plaintiffs do not dispute the literal truth of any statements on the Products' labels.  Instead, Plaintiffs allege that the Products' labeling and advertising *imply* a variety of health-related messages that, according to Plaintiffs, are unsupported by competent and reliable scientific evidence.  As a result, Plaintiffs allege they were "deceived" into "buying a product that they would not have purchased" or "paying an excessive premium price."  (*Id.* ¶¶ 49, 56.)

**1.      The "Splenda Essentials" Name**

The name "Splenda® Essentials™ No Calorie Sweetener" appears on the primary display panel ("PDP") of each Product, together with a photograph depicting a complete breakfast of cereal, fruit, and coffee.[3]  With respect to all three Products, Plaintiffs allege that the word "Essentials" in the Splenda Essentials name is misleading because it "cues consumers to think" that the Products are "a *necessity*" — *i.e.*, that "consumers *need* [them] in order to be healthy." (*Id.* ¶¶ 5, 16 (emphases in original).)

**2.      The Fiber Product**

The PDP of the Fiber Product states that the product contains Splenda no-calorie sweetener and "1 gram of fiber in each packet":

/ / /

/ / /

/ / /

---

[3] The PDPs and full labels are annexed as Exhibits A-C to McNeil's Request for Judicial Notice.  The Court may take judicial notice of the Products' labels because they are referenced in the FAC.  *See McKinnis v. Sunny Delight Beverages Co.*, 2007 U.S. Dist. LEXIS 96108, at *9-10 n.1 (C.D. Cal. Sept. 4, 2007).  Moreover, because the labels can be judicially noticed, the Court need not accept as true Plaintiffs' erroneous characterizations of the labels' contents.  *Id.*

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION & MOTION TO DISMISS
PURSUANT TO FRCP12(B)(6)                - 4 -                CASE NO. 3:12-cv-04184-CRB

1
2
3
4
5
6
7



8
9
10

The back of the box also states that "Each packet has the sweet taste of SPLENDA® No Calorie

Sweetener" and "1 gram of healthy fiber."  (Ex. A to McNeil's Req. for Judicial Notice.)

Plaintiffs do not dispute that the Fiber Product contains 1 gram of fiber per packet.

11
12
13
14
15
16

Rather, they allege that the words "fiber" and "healthy fiber," together with the illustration of

cereal and fruit, imply that the Fiber Product provides "the same health benefits as [consumers]

would [receive] from fibers found in whole foods."  (*Id.* ¶ 27.)  According to Plaintiffs, this

implied message is false because the Fiber Product contains "refined, processed fiber" rather than

"whole, intact fibers," and "there is no scientific consensus that refined fibers function like intact

fibers" in the body.  (*Id.* ¶¶ 27-28.)

17
18

**3.     The Antioxidants Product**

The PDP of the Antioxidants Product identifies it as Splenda no-calorie sweetener "with

19
20

antioxidants* in each packet":

21
22
23
24
25
26
27



28

The asterisk after the word "antioxidants" is linked directly to the phrase "20% Daily Value of Antioxidants Vitamins C and E in each packet," which also appears on the PDP.

Plaintiffs acknowledge that the Antioxidants Product "*do[es]* provide 20%" of the RDI of vitamins C and E per packet, and that vitamins C and E are, in fact, "antioxidant vitamins." (FAC ¶ 23 (emphasis in original).) However, according to Plaintiffs, the word "antioxidants" alongside images of "strawberries, raspberries, and blueberries" implies that the Antioxidants Product is "derived from real fruit" and "provide[s] the same health benefits" as the actual fruits. (*Id.* ¶¶ 10, 23.) Plaintiffs allege that these supposedly implied messages are false because the vitamin E in the Antioxidants Product is "synthetic" and therefore inferior to natural vitamin E, and because, in any event, "clinical trials have failed to find that antioxidant vitamins lower the risk of cardiovascular disease, cancer, or cognitive decline." (*Id.* ¶ 22-25 & nn.17-23.)

### 4.    The B Vitamins Product

The PDP for the B Vitamins Product identifies it as Splenda no-calorie sweetener "with B vitamins" and states that the Product contains "20% Daily Value of B Vitamins $B_1$, $B_5$ and $B_6$ in each packet":



The PDP further includes the statement "with B Vitamins To Help Support a Healthy Metabolism." As explained in detail below, this is a "structure/function" claim, which FDA defines as a claim that "describe[s] the role of a nutrient" in the "normal structure or function" of the human body. FDA expressly permits such claims on labeling for conventional foods. FDA, *Claims That Can Be Made for Conventional Foods and Dietary Supplements*, Sept. 2003, http://www.fda.gov/food/labelingnutrition/labelclaims/ucm111447.htm (hereinafter "*Claims for*

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION & MOTION TO DISMISS
PURSUANT TO FRCP12(B)(6)                   - 6 -                   CASE NO. 3:12-cv-04184-CRB

*Foods*").[4]

Here, again, Plaintiffs do not dispute that the B Vitamins Product contains 20% of the RDI of the specified B vitamins in each packet.  Nor do Plaintiffs dispute that B vitamins help support a healthy metabolism.  In fact, CSPI's website acknowledges that vitamin $B_6$ — one of the vitamins in the B Vitamins Product — "performs a central role in amino acid metabolism."  *See* CSPI, *Learn About Food Additives*, http://www.cspinet.org/reports/chemcuisine.htm#pyridoxine. Nevertheless, Plaintiffs allege that the phrases "with B vitamins" and "To Help Support a Healthy Metabolism" imply that the product will "give [consumers] a '*faster* metabolism'" and thereby hasten "weight loss."  (*Id.* ¶¶ 9, 18 (emphasis added).)   Plaintiffs allege that this purportedly implied message is false because "[n]o reliable studies show that B vitamin supplementation promotes weight loss or weight management."  (*Id.* ¶ 20.)

### 5.      Websites And Advertising

Plaintiffs also take issue with statements on the Products' websites.  Specifically, Plaintiffs allege that "[t]he [B Vitamins Product] website is deceptive because it describes how all three B vitamins together support the metabolism of fats, carbohydrates, and proteins" (*id.* ¶ 19); the Antioxidants Product website is deceptive because it uses the phrase "20% of the daily value of antioxidant vitamins C and E, like those found in fruits and vegetables" (*id.* ¶ 23); and the Fiber Product website is deceptive because it "descri[bes] the health benefits of fiber," uses the phrases "small boost of healthy fiber" and "easy way to bump up your fiber intake," and "suggests that most adults are deficient . . . in their daily fiber intake."  (*Id.* ¶ 27.)  The FAC also reproduces a print advertisement for the B Vitamins Product that includes the statement "Now With An Extra Boost Of Nutrients."  (*Id.* at 8.)

Notably, however, none of the Plaintiffs alleges that he or she visited any of these websites or saw any advertisement prior to purchasing the Products.  *A fortiori*, Plaintiffs do not

---

[4] Regulatory documents are properly subject to judicial notice on a motion to dismiss.  *See Hansen Beverage Co. v. Innovation Ventures, LLC*, 2009 U.S. Dist. LEXIS 127605, at *6-7 (S.D. Cal. Dec. 22, 2009).  "This includes public records and government documents available from reliable sources on the Internet."  *United States ex rel. Dingle v. BioPort Corp.*, 270 F. Supp. 2d 968, 972 (W.D. Mich. 2003), *aff'd*, 388 F.3d 209 (6th Cir. 2004).

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION & MOTION TO DISMISS
PURSUANT TO FRCP12(B)(6)                     - 7 -                     CASE NO. 3:12-cv-04184-CRB

1   allege that these statements had any causal connection to their purchase of the Products.

2   * * *

3   Based on the above allegations, Plaintiffs assert statutory claims under California's Unfair

4   Competition Law ("UCL") (Cal. Bus. & Prof. Code § 17200 *et seq.*) (Counts I-III), California's

5   False Advertising Law ("FAL") (Cal. Bus. & Prof. Code § 17500 *et seq.*) (Counts IV-V), and

6   California's Consumer Legal Remedies Act ("CLRA") (Cal. Civ. Code § 1750 *et seq.*) (Count

7   VI), as well as claims for unjust enrichment (Count VII) and breach of implied warranty of

8   merchantability (Count VIII) under California common law.

9   **C.      Statutory And Regulatory Framework**

10   Conspicuously absent from the FAC is any acknowledgement that FDA extensively

11   regulates the statements that manufacturers can make regarding the vitamins and nutrients in food

12   products.  Congress enacted the FDCA in 1938, creating "a comprehensive federal scheme for the

13   regulation of food," *Peviani v. Hostess Brands, Inc.*, 750 F. Supp. 2d 1111, 1117 (C.D. Cal.

14   2010), and giving FDA broad authority to "promote honesty and fair dealing in the interest of

15   consumers," 21 U.S.C. § 341; *see also* 21 U.S.C. § 371 (authorizing FDA to "promulgate

16   regulations for the efficient enforcement" of the FDCA).

17   For much of the 20th century, FDA effectively prohibited health-related claims in labeling

18   and advertising for food products.  *See* Richard M. Cooper, et al., *History of Health Claims*

19   *Regulation*, 45 Food Drug Cosm. L.J. 655, 658-60 (1990); Peter Barton Hutt, *Government*

20   *Regulation of Health Claims in Food Labeling and Advertising*, 41 Food Drug Cosm. L.J. 3, 27-

21   34, 42-49 (1986) (hereinafter "*Regulation of Health Claims*").  But beginning in the 1950s, new

22   scientific evidence emerged that foods, and certain nutrients in particular, play an important role

23   in maintaining good health.  *See* Cooper, *supra*, at 660; Hutt, *Regulation of Health Claims* at 28-

24   30, 38-40.  With this evolution in scientific understanding, FDA eventually recognized that

25   "appropriate health messages" on food labels "may provide valuable information."  *Public Health*

26   *Messages on Food Labels and Labeling*, 52 Fed. Reg. 28843, 28845 (Aug. 4, 1987).  However,

27   FDA repeatedly put off promulgating "a final rule [to] define[] a 'safe harbor'" for permissible

28   claims.  *Health Messages and Label Statements; Reproposed* Rule, 55 Fed. Reg. 5176, 5184 (Feb.

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION & MOTION TO DISMISS
PURSUANT TO FRCP12(B)(6)                    - 8 -                    CASE NO. 3:12-cv-04184-CRB

13, 1990); *see* Peter Barton Hutt, *A Brief History of FDA Regulation Relating to the Nutrient Content of Food* at 10-11 (hereinafter "*Brief History*") (in Ralph Shapiro, ed., NUTRITIONAL LABELING HANDBOOK (1995)); Cooper, *supra*, at 663-67, 686-91.

In the absence of clear guidance from FDA, a confusing array of nutrition and health-related claims proliferated throughout the grocery store, and states stepped in "to fill [the] perceived federal regulatory void." Cooper, *supra*, at 678-81. This resulted in a disorganized patchwork of state food-labeling standards that placed unreasonable burdens on manufacturers and raised prices for consumers, much to the concern of Congress. *See* 136 Cong. Rec. H5836, H5840 (daily ed. July 30, 1990) (statement of Rep. Waxman) (noting that the "numerous conflicting and inconsistent State and local laws . . . with respect to food labels" make it "difficult and even impossible for [food] companies to operate in interstate commerce"); 136 Cong. Rec. S16607, S16611 (daily ed. Oct. 24, 1990) (statement of Sen. Hatch) ("[I]nconsistent State and local laws seriously disrupt food manufacturing . . . , resulting in higher prices for consumers.").

Ultimately, Congress felt compelled to take action. *See* Hutt, *Brief History* at 11. In 1990, it passed the Nutrition Labeling and Education Act ("NLEA"), Pub. L. No. 101-535, 104 Stat. 2353, intending to "make sense of the confusing array of nutrition labels that confront all consumers every time they enter the supermarket," 136 Cong. Rec. H5836, H5840 (daily ed. July 30, 1990) (statement of Rep. Waxman), "while providing the industry with uniformity of law . . . that will permit them to conduct their business of food distribution in an efficient and cost-effective manner." *Id.* at H5843 (statement of Rep. Madigan). Congress sought to achieve these goals in two related ways.

First, the NLEA amended the FDCA to "establish the circumstances under which claims may be made [on product labels] about nutrients in food." H.R. Rep. No. 101-538, at 7 (1990) (quoted in *Peviani*, 750 F. Supp. 2d at 1117). More specifically, it "expanded the coverage of nutrition labeling requirements; it changed the form and substance of ingredient labeling on packages; it imposed limitations on health claims; it standardized the definitions of all nutrient content claims; and it required more uniform serving sizes." *Briseno v. Conagra Foods, Inc.*, 2011 U.S. Dist. LEXIS 154750, at *12-13 (C.D. Cal. Nov. 23, 2011).

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION & MOTION TO DISMISS
PURSUANT TO FRCP12(B)(6)                    - 9 -                    CASE NO. 3:12-cv-04184-CRB

Second, the NLEA provided that federal law would expressly "preempt non-identical [state-law] requirements in the field of food labeling." *Turek v. Gen. Mills, Inc.*, 754 F. Supp. 2d 956, 958 (N.D. Ill. 2010), *aff'd*, 662 F.3d 423 (7th Cir. 2011). Section 6 of the NLEA, codified at 21 U.S.C. § 343-1(a) and entitled "National Uniform Nutrition Labeling," directs that

> no State or political subdivision of a State may directly or indirectly establish under any authority or continue in effect as to any food in interstate commerce . . .
>
> (4) any requirement for nutrition labeling of food that is not identical to the requirement of section 403(q) [21 U.S.C. § 343(q)] . . .[5] or
>
> (5) any requirement respecting any claim of the type described in section 403(r)(1) [21 U.S.C. § 343(r)(1)] made in the label or labeling of food that is not identical to the requirement of section 403(r) [21 U.S.C. § 343(r)] . . . .[6]

A state requirement is "not identical to" federal requirements — and thus preempted — if it "directly or indirectly" imposes labeling obligations that are "not imposed by or contained in the applicable [federal] provision (including any implementing regulation)" or that "[d]iffer from those specifically imposed or contained in the applicable provision." 21 C.F.R. § 100.1(c)(4). This sweeping definition of "not identical to" means the NLEA's preemption clause is broader than those of other federal statutes. *See Mills v. Giant of Md., LLC*, 441 F. Supp. 2d 104, 108 (D.D.C. 2006). It also means that "some stringent State laws will be preempted by less restrictive Federal regulations." *State Petitions Requesting Exemption from Federal Preemption*, 58 Fed. Reg. 2462, 2462 (Jan. 6, 1993).

The NLEA's "effective[] remov[al] [of] state and local government from establishing regulatory requirements relating to the nutrient content of food" represented "a major change in national food policy," Hutt, *Brief History* at 12, and it required FDA to establish uniform

---

[5] 21 U.S.C. § 343(q), titled "Nutrition information," specifies what information a food's label must disclose with respect to its nutrient content (dietary fiber, vitamins, etc.).

[6] 21 U.S.C. § 343(r), titled "Nutrition levels and health-related claims," details when, *inter alia*, a food label may "expressly or by implication" "characterize[] the level of any nutrient which is of the type required . . . to be in the label or labeling of the food" or "characterize [] the relationship of any [such] nutrient . . . to a disease or a health-related condition."

1   nationwide rules governing nutritional disclosures and claims on food labeling.  FDA spent years

2   doing just that.  *See id.* at 11-22.  In particular, through notice-and-comment rulemaking, FDA

3   promulgated regulations that tell manufacturers what types of nutrient- and health-related claims

4   may be made on foods, and how those claims should be worded.  *See Claims for Foods*, *supra*;

5   Conventional *Foods Being Marketed as "Functional Foods,"* 71 Fed. Reg. 62400, 62402-03

6   (Oct. 25, 2006).

7         McNeil scrupulously follows these FDA prescriptions in labeling the Products, employing

8   labeling statements and conventions that FDA has carefully considered and approved.   In fact, as

9   explained below, each statement that Plaintiffs contest is expressly authorized by federal law.

10                                   **ARGUMENT**

11        "Dismissal is proper where a complaint lacks a 'cognizable legal theory' or sufficient facts

12   to support one."  *Hao v. New Century Mortg. Corp.*, 2012 U.S. Dist. LEXIS 97787, at *5 (N.D.

13   Cal. July 13, 2012) (Breyer, J.).  A complaint must contain "sufficient factual matter, accepted as

14   true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

15   (2009).  Moreover, because false-advertising claims under the UCL, FAL, and CLRA "are

16   grounded in fraud," the complaint must meet the heightened pleading requirement of Federal

17   Rule of Civil Procedure 9(b).  *See Briseno*, 2011 U.S. Dist. LEXIS 154750, at *29-41 (citing

18   *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2003)).  Under Rule 9(b), "general

19   allegations" that a defendant has made false representations "will not suffice."  *Id.* at *34.  The

20   complaint must "allege[] with particularity when, where, and how the alleged misrepresentations

21   were communicated" and "which [statements] [the plaintiff] relied upon in making his decision to

22   buy."  *Id.* at *38.

23        In deciding a motion to dismiss, "all well-pleaded allegations of material fact are taken as

24   true and construed in the light most favorable to the non-moving party."  *Hao*, 2012 U.S. Dist.

25   LEXIS 97787, at *4.  "However, a court need not accept as true unreasonable inferences,

26   unwarranted deductions of fact, or legal conclusions merely because they are cast in the form of

27   factual allegations."  *McKinniss v. Sunny Delight Beverages Co.*, 2007 U.S. Dist. LEXIS 96108,

28   at *4 (C.D. Cal. Sept. 4, 2007) (*McKinniss I*) (citing *Sprewell v. Golden State Warriors*, 266 F.3d

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION & MOTION TO DISMISS
PURSUANT TO FRCP12(B)(6)                    - 11 -                    CASE NO. 3:12-cv-04184-CRB

1    979, 988 (9th Cir. 2001)); *see also Iqbal*, 556 U.S. at 679-81.

2    **I.        Plaintiffs' Claims Are All Preempted By Federal Law**

3            The Supremacy Clause of the United States Constitution, U.S. CONST. art. VI cl. 2,

4    establishes that "any state law, however clearly within a State's acknowledged power, which

5    interferes with or is contrary to federal law, must yield." *Free v. Bland*, 369 U.S. 663, 666 (1962)

6    (citing *Gibbons v. Ogden*, 22 U.S. 1, 9 Wheat. 1, 210-11 (1824)).  Accordingly, "[c]onsumer

7    protection laws, such as the UCL, FAL, and CLRA, are . . . preempted if they seek to impose

8    requirements that contravene the requirements set forth by" federal law.  *Peviani*, 750 F. Supp. 2d

9    at 1118; *see also Degelmann v. Advanced Med. Optics, Inc.,* 659 F.3d 835, 842 (9th Cir. 2011).

10   The same is true of common-law claims such as breach of warranty.  *See Meaunrit v. Pinnacle*

11   *Foods Group, LLC*, 2010 U.S. Dist. LEXIS 43858, at *27-31 (N.D. Cal. May 5, 2010).

12           Through the NLEA amendments to the FDCA, Congress mandated national uniform

13   labeling standards for foods.  By "extensively regulating" the labeling of food products, the

14   "FDCA and its implementing regulations have identified the words and statements that must or

15   may be included on labeling and have specified how prominently and conspicuously those words

16   and statements must appear."  *Pom Wonderful LLC v. Coca-Cola Co.*, 679 F.3d 1170, 1177 (9th

17   Cir. 2012).

18           In addition to enacting its own comprehensive regulatory scheme, Congress has expressly

19   preempted states from imposing any "requirements" concerning food labeling that are "not

20   identical to" the standards set by federal law.  *See* 21 U.S.C. § 343-1(a).  The statutory term

21   "requirements" necessarily "sweeps broadly," encompassing state "statutes and regulations, as

22   well as common-law duties and judge-made rules."  *Turek*, 754 F. Supp. 2d at 958-59; *see also*

23   *Chacanaca v. Quaker Oats Co.*, 752 F. Supp. 2d 1111, 1118 (N.D. Cal. 2010).  A state-law

24   requirement is "not identical" to federal law when it "directly or indirectly" imposes labeling

25   obligations that are "not imposed by or contained in the applicable [federal] provision (including

26   any implementing regulation)" or that "[d]iffer from" federal requirements.  21 C.F.R. §

27   100.1(c)(4); *see also Turek*, 662 F.3d at 427 ("Even if the disclaimers that the plaintiff wants

28   added would be consistent" with the FDCA, "consistency is not the test; identity is.").

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION & MOTION TO DISMISS
PURSUANT TO FRCP12(B)(6)                    - 12 -                    CASE NO. 3:12-cv-04184-CRB

Plaintiffs here are seeking to do precisely what Congress has forbidden.  At Congress's direction, FDA has established uniform regulations and rules that tell food manufacturers what nutrition information they must disclose, *see* 21 U.S.C. § 343(q), and what types of nutrient-content and health-related claims they can make, *see id.* § 343(r)(1), on food labels.  The FDCA expressly preempts state-law requirements not identical to those found in these statutes or their implementing regulations.  *See* 21 U.S.C. § 343-1(a); *Fidelity Fed. Savings & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 153 (1982) (noting that "[f]ederal regulations have no less pre-emptive effect than federal statutes").  Each of the label claims that Plaintiffs contest is authorized by FDA regulations.  Plaintiffs may not seek to use California law to impose labeling requirements that differ from those that Congress and FDA have established.  *See, e.g.*, *Lam v. Gen Mills, Inc.*, 2012 U.S. Dist. LEXIS 65815, at *7-12 (N.D. Cal. May 10, 2012); *Dvora v. Gen. Mills, Inc.*, 2011 U.S. Dist. LEXIS 55513, at *15-22 (C.D. Cal. May 16, 2011); *Carrea v. Dreyer's Grand Ice Cream, Inc.*, 2011 U.S. Dist. LEXIS 6371, at *9 (N.D. Cal. Jan. 10, 2011), *aff'd*, 2012 U.S. App. LEXIS 6851 (9th Cir. Apr. 5, 2012); *Chacanaca*, 752 F. Supp. 2d at 1118-23.

A.      **The Fiber Product**

Plaintiffs allege that the references to "fiber" on the Fiber Product's label are deceptive because the product contains "refined, processed fiber" and "there is no scientific consensus that refined fibers function like intact fibers" in the body.  (FAC ¶¶ 27-28.)  This claim is squarely preempted by the FDCA and its implementing regulations, which make no distinction between "processed" fibers and "intact" fibers.  Indeed, a virtually identical claim was recently rejected by the Seventh Circuit on preemption grounds in *Turek v. General Mills, Inc.*, 754 F. Supp. 2d 956 (N.D. Ill. 2010), *aff'd*, 662 F.3d 423 (7th Cir. 2011).

At issue in *Turek* was the labeling and advertising for Fiber One Chewy Bars, which claimed that the product contains "35% of your daily fiber" and that fiber is found in "foods like beans and other legumes, fruits and oat products."  Plaintiffs alleged that these claims violated Illinois law because the product "contains non-natural fibers, [which] have not been shown by current scientific evidence to possess all of the health benefits of natural fibers."  754 F. Supp. 2d at 956-57.  In affirming the dismissal of the complaint, the Seventh Circuit explained that the

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION & MOTION TO DISMISS
PURSUANT TO FRCP12(B)(6)          - 13 -          CASE NO. 3:12-cv-04184-CRB

express preemption clause added by the NLEA, 21 U.S.C. § 343-1(a)(5), "forbids states . . . to impose 'any requirement respecting any claim of the type described in section 343(r)(1) [of the FDCA] . . . made in the label or labeling of food that is not identical to the requirement of section 343(r).'"  662 F.3d at 426.  Section 343(r)(1)(A), in turn, "governs 'a claim . . . which expressly or by implication characterizes the level of any nutrient which is of the type required by [section 343](q)(1).'"  *Id.*  Judge Posner, writing for the court, continued:

> So we go to section 343(q)(1) and find in subsection (D) a requirement . . . that the "label or labeling" of food products intended for human consumption state "the amount of . . . dietary fiber . . . contained in each serving size or other unit of measure." Other requirements for labeling claims relating to dietary fiber are set forth in implementing regulations of the Food and Drug Administration . . . . The form and content of such claims are set forth in 21 C.F.R. § 101.54(d). The labeling of [the bars] . . . is compliant with that regulation and with the other regulations relating to health claims for dietary fiber. *See, e.g.,* 21 C.F.R. § 101.76.  All the FDA's requirements relating to labeling that mentions dietary fiber are incorporated in section 343(r)(1) as requirements to which any labeling disclosures required by a state must be identical.

*Id.* at 426-27.  Since "[t]he information required by federal law does not include disclosing that the fiber in the product includes ['processed' fiber] or that a product containing ['processed' fiber] produces fewer health benefits than a product that contains only ['intact'] fiber," and since all state-law requirements that are "not identical to" federal requirements are expressly preempted, plaintiffs' claims were barred.  *Id.* at 427; *see also* 754 F. Supp. at 960-61 (noting that applicable FDA regulations "distinguish[] only between soluble and insoluble fiber" and do not "direct manufacturers to label certain fiber nutrients as 'non-natural' [or] to disclose [their] alleged lack of health benefits").

The same is true here.  The FDCA and its implementing regulations dictate the permissible statements and required disclosures concerning the fiber content of all foods, including the Fiber Product.  The Fiber Product "is compliant with" these federal prescriptions, *see* 662 F.3d at 427, and Plaintiffs do not allege otherwise.[7]  Indeed, as recently as 2007, FDA

---

[7] To the contrary, CSPI acknowledges on its website that FDA recognizes no distinction between processed fiber and intact fiber.  *See* CSPI, *H₂NO: The Scoop on Enhanced Waters*, Nutrition Action Healthletter, June 2008, at 1, http://www.cspinet.org/nah/06_08/h2no.pdf

1  evaluated a proposal to split the single category of "dietary fiber" into two separate categories:

2  fiber that is "intrinsic and intact in plants," and so-called functional fiber (*i.e.*, fiber that is

3  "isolated or extracted" or "synthetically manufactured").  *See Food Labeling: Revision of*

4  *Reference Values and Mandatory Nutrients*, 72 Fed. Reg. 62149, 62166-67 (Nov. 2, 2007).  After

5  carefully considering the issue, FDA decided not to adopt this approach.  *See id.* at 62167 (finding

6  it "more practical" to continue "using the current methods" of fiber labeling).[8]

7       In short, Plaintiffs' claims with respect to the Fiber Product seek to impose labeling

8  restrictions that (1) are "not identical to" the detailed requirements of the FDCA and its

9  implementing regulations, and (2) FDA has explicitly rejected.  As in *Turek*, these claims are

10 expressly preempted.

11 **B.      The Antioxidants Product**

12      Plaintiffs allege that the label of the Antioxidants Product is misleading because one of the

13 antioxidants in the product, vitamin E, is synthetic.  Plaintiffs further allege that the label implies

14 that the product's antioxidants "provide the same health benefits" as real fruit and that, in any

15 event, antioxidants have not been proven to "lower the risk of cardiovascular disease, cancer, or

16 cognitive decline."  (FAC ¶¶ 10, 22-25 & nn.17-23.)

17      As with fiber, FDA has issued detailed regulations that dictate precisely when "[n]utrient

18 content claims that use the term 'antioxidant'" may be made.  21 C.F.R. § 101.54(g).  Such claims

19 are permitted where four criteria are met:  (1) "[a]n RDI has been established for each of the

20 nutrients" described as antioxidants; (2) those nutrients "have recognized antioxidant activity," in

21 that "there exists scientific evidence that . . . the substance participates in physiological,

22
   _____

23 (noting that, "[a]ccording to the government," processed fibers are classified as "fiber"); CSPI,
   *Candy Scam*, Nutrition Action Healthletter, March 2006,
24 http://www.cspinet.org/nah/03_06/rsvfp_can.pdf (labeling processed fibers as "fiber" is "allowed
   in the U.S.").

25      [8] Unsatisfied with this pronouncement, CSPI has urged FDA to reconsider its position and
   to prohibit processed fibers from being labeled as "fiber."  *See* CSPI, *Food Labeling Chaos: The*
26 *Case for Reform* (2010), http://www.cspinet.org/new/pdf/food_labeling_chaos_report.pdf, at II-9
   ("The FDA should also clarify that the definition of fiber only includes intact fibers from whole . .
27 . foods."); *see also* CSPI, *Food Label Makeovers Proposed by CSPI*, Dec. 7, 2009,
   http://www.cspinet.org/new/200912071_print.html.  FDA has refused to do so.

28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION & MOTION TO DISMISS
PURSUANT TO FRCP12(B)(6)                    - 15 -                    CASE NO. 3:12-cv-04184-CRB

biochemical, or cellular processes that inactivate free radicals"; (3) the product contains 10% or more of the RDI for each nutrient claimed to be an antioxidant; and (4) "[t]he names of the nutrients . . . are included as part of the claim" or the claim is "linked by a symbol (e.g., an asterisk)" to the names of the nutrients appearing elsewhere on the label. *Id.*

The Antioxidants Product indisputably satisfies these regulatory requirements.  There are established RDIs for both vitamin C and vitamin E.  *See* 21 C.F.R. § 101.9(c)(8)(iv).  FDA has determined that vitamin C and vitamin E have "antioxidant properties."  *See Nutrient Content Claims: Definition for "Antioxidant,"* 62 Fed. Reg. 49868, 49873 (Sept. 23, 1997).  The product contains more than 10% of the RDI for vitamins C and E (indeed, each packet contains *twice* the required amount of both nutrients).  (*See* Ex. B to McNeil's Req. for Judicial Notice.)  And the PDP identifies vitamin C and vitamin E as the antioxidants in the product and "link[s]" their names to the word "antioxidants" with an asterisk.  (*See id.*)  In short, federal law affirmatively permits the "antioxidants" statements that appear on the label of the Antioxidants Product.

Plaintiffs' claim that these statements nonetheless violate California law is expressly preempted.  As detailed above, 21 U.S.C. § 343-1(a)(4) dictates that "no state . . . may directly or indirectly establish under any authority . . . any requirement for nutrition labeling of food that is not identical to the requirement of section 343(q) of this title."  Section 343(q) mandates national uniform labeling with respect to nutrient-content claims for certain vitamins, one of which is vitamin C.  *See Food Labeling: Mandatory Status of Nutrition Labeling and Nutrient Content Revision, Format for Nutrition Label*, 68 Fed. Reg. 2079, 2108 (Jan. 6, 1993) ("FDA[] has determined that . . . vitamin C . . . meet[s] the criterion in section 403(q)(1)(E) [21 U.S.C. § 343(q)(1)(E)] of the Act").  Vitamin E is also subject to 343(q) when it is "added as a nutrient supplement, or when a claim is made" about it.  21 C.F.R. § 101.9(c)(8)(ii), (iv); *see Food Labeling; Reference Daily Intakes and Daily Reference Values*, 58 Fed. Reg. 2206 (Jan. 6, 1993).  And FDA has issued regulations that "define the circumstances in which claims can be made that characterize the level of 'antioxidant' substances" — such as vitamins C and E — on food labels.  *See Food Labeling; Nutrient Content Claims: Definition for "High Potency" and Definition of "Antioxidant" for Use in Nutrient Content Claims for Dietary Supplements and Conventional*

*Foods*, 62 Fed. Reg. 49868, 49872-73 (Sept. 23, 1997) (codified at 21 C.F.R. § 101.54(g)).  There

is no room for non-identical state regulation.

Moreover, as with the Fiber Product, FDA has previously considered — and rejected —

the very arguments that Plaintiffs raise here.  First, contrary to Plaintiffs' suggestion that synthetic

vitamins are inherently inferior, FDA expressly permits foods to "include natural and synthetic

vitamins," *Nutrition Labeling and Ingredient Labeling of Dietary Supplements*, 62 Fed. Reg.

49826, 49836 (Sept. 23, 1997), and has determined that there "is no nutritional difference

between a vitamin provided by a synthetic source and the same vitamin provided by a natural

source," *Regulations for Enforcement of the FDCA*, 38 Fed. Reg. 2125, 2128 (Jan. 19, 1973).[9]

Indeed, for precisely these reasons, FDA affirmatively *prohibits* manufacturers from labeling

products in any manner that suggests that "a natural vitamin in a food is superior to an added or

synthetic vitamin."  21 C.F.R. § 101.9(k)(4).  After the passage of the NLEA, FDA considered

whether to revise its longstanding policy regarding synthetic vitamins, specifically in light of the

difference in "biological activity" between natural and synthetic vitamin E that Plaintiffs

reference in the FAC.  *See* 62 Fed. Reg. at 49841.  FDA expressly declined to do so.  *See id.*[10]

Second, FDA has rejected the proposition that an antioxidant must be scientifically proven

to "lower the risk of cardiovascular disease, cancer, or cognitive decline" before its presence in a

---

[9] *See also Regulations for the Enforcement of the FDCA*, 38 Fed. Reg. 6951, 6958 (Mar. 14, 1973) (noting that "there is no valid scientific evidence to support . . . a claim of superiority" of natural vitamins); *Regulations for the Enforcement of the FDCA*, 38 Fed. Reg. 2125, 2128 (Jan. 19, 1973) (noting FDA's disapproval of the claim that "'natural' sources of vitamins are different and better than vitamins chemically produced").

[10] The FAC alleges that the vitamin E in the Antioxidants Product has "one-half of the biological activity of . . . the type of vitamin E found [naturally] in whole foods."  (FAC ¶ 23.) The allegation is highly misleading.  While vitamin E does come in different forms with different levels of bioactivity, these differences are taken into account by the mathematical formula used to calculate the percentage of the RDI of vitamin E that a product provides per serving.  *See* Institute of Medicine, *Food and Nutrition Board, Dietary Reference Intakes for Vitamin C, Vitamin E, Selenium, and Carotenoids* (2000) at 187-92 (Ex. E to McNeil's Req. for Judicial Notice) (cited in ¶ 23 of the FAC).
        The Antioxidants Product's label clearly states that it provides 20% of the RDI for vitamin E per serving.  Plaintiffs concede that this statement is accurate.  (*See* FAC ¶ 23.)  The allegation that the form of vitamin E in the product may be less "biologically active" than other types of vitamin E is, therefore, immaterial.

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION & MOTION TO DISMISS
PURSUANT TO FRCP12(B)(6)                    - 17 -                    CASE NO. 3:12-cv-04184-CRB

product may be highlighted.  During the notice-and-comment period that preceded enactment of FDA's antioxidant-claim regulation, FDA considered a suggestion that antioxidant claims on food labeling would "send a misleading message to consumers that these nutrients will prevent disease . . . and that the consumption of . . . antioxidants in and of itself provides health benefits." FDA disagreed, finding "[n]o evidence" that antioxidant claims that meet FDA's requirements would convey such a message.  62 Fed. Reg. at 49873-74.

Plaintiffs' FAC refers to an undisclosed "consumer perception survey" that purportedly shows that — contrary to FDA's conclusion — some consumers do infer such messages from the Antioxidants Product's label.  (FAC ¶¶ 21, 25, 28.)  Such survey data, however, does not entitle private plaintiffs to overturn FDA's conclusion or override FDA regulations.  Rather, if Plaintiffs believe that FDA's regulations are too lax or are themselves misleading, there is "no apparent reason why [Plaintiffs] cannot ask the FDA to reconsider" its rule "in light of the survey evidence" that they have purportedly collected.  *Am. Home Prods. Corp. v. Johnson & Johnson*, 672 F. Supp. 135, 145 (S.D.N.Y. 1987).

In sum, federal law expressly permits "antioxidant" claims under the circumstances present here.  The label for the Antioxidants Product complies fully with the FDCA and FDA regulations, and Plaintiffs do not (and cannot) allege otherwise.  Plaintiffs' claims regarding the labeling of the Antioxidants Product are, therefore, preempted.

## C.    The B Vitamins Product

Plaintiffs allege that the label statement "with B Vitamins To Help Support a Healthy Metabolism" implies that the vitamins in the B Vitamins Product will facilitate weight loss when, in reality, "[n]o reliable studies show that B vitamin supplementation promotes weight loss or weight management."  (FAC ¶ 20.)  This claim, too, is preempted.

As noted above, the statement "with B Vitamins To Help Support a Healthy Metabolism" is a "structure/function" claim — *i.e.*, a statement that "describe[s] the role of a nutrient . . . intended to affect normal structure or function in humans" or "characterize[s] the means by which a nutrient . . . acts to maintain such structure or function."  *Claims for Foods*, *supra*; *see also Regulations Made for Dietary Supplements Concerning the Effect of the Product on the Structure*

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION & MOTION TO DISMISS
PURSUANT TO FRCP12(B)(6)                    - 18 -                    CASE NO. 3:12-CV-04184-CRB

1    *or Function of the Body (Final Rule)*, 65 Fed. Reg. 1000, 1001 (Jan. 6, 2000); 21 C.F.R. §

2    101.93(f); 21 U.S.C. § 343(r)(6)(A); FDA, *Guidance for Industry and FDA: Dear Manufacturer*

3    *Letter Regarding Food Labeling*, Jan. 2007, http://www.fda.gov/Food/

4    GuidanceComplianceRegulatoryInformation/GuidanceDocuments/FoodLabelingNutrition/ucm05

5    3425.htm (hereinafter "*Guidance for Industry*").[11]

6        Federal law expressly permits structure/function claims on food labels.  *See* 21 C.F.R. §

7    101.93(f) (emphasis added); *see also* 65 Fed. Reg. at 1033 ("conventional foods may make

8    structure/function claims"); FDA Warning Letter to Hill's Pet Nutrition, Inc., Nov. 23, 2011,

9    http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2011/ucm281270.htm (FDCA

10    "permits foods to make appropriate structure/ function claims"); *Guidance for Industry*, *supra*

11    ("'Structure/function' claims can be made on the labels of conventional foods.").  In fact, as

12    explained below, because they provide valuable information, FDA allows food manufacturers to

13    make truthful structure/function claims despite the fact that some consumers may misinterpret

14    them, or not fully understand what they mean.

15        **1.**      **FDA's Regulation Of Structure/Function Claims**

16        Manufacturers' authority to make structure/function claims on food labels derives from

17    the statutory definition of "drug" in § 201(g)(1)(C) of the FDCA, which exempts "articles . . . [of]

18    food . . . intended to affect the structure or any function of the body" from regulation under the

19    drug regime.  21 U.S.C. § 321(g)(1)(C).  Congress, FDA, and the courts have interpreted this

20    carve-out to permit food manufacturers to make claims about a food's effect on the structure or

21    function of the human body.  *See, e.g.*, Conference Report on Dietary Supplement Health and

22    Education Act of 1994, 103 S. Rep. 410 (Oct. 8, 1994) (noting that claims about a food's "effect

23    on . . . structure or function" enjoy "protection" under "current law" and citing § 201(g) of the

24    FDCA); 65 Fed. Reg. at 1033 (noting that "conventional foods may make structure/function

25    claims under section 201(g)(1)(C) of the [FDCA]"); *Am. Health Prods. Co. v. Hayes*, 574 F.

26

27        [11] The Ninth Circuit has held that FDA "Guidance for Industry" documents embody
federal policy and, therefore, have preemptive effect.  *See Degelmann*, 659 F.3d at 841-42.

28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION & MOTION TO DISMISS
PURSUANT TO FRCP12(B)(6)      - 19 -      CASE NO. 3:12-cv-04184-CRB

1   Supp. 1498, 1507 (S.D.N.Y. 1983) (citing § 201(g)(1)(C) as permitting claims about foods' effect

2   on "bodily structure or function"), *aff'd*, 744 F.2d 912 (2d Cir. 1984).

3        FDA nonetheless has promulgated detailed regulations concerning structure/function

4   claims for *dietary supplements*.  Prior to 1994, FDA took the position that, whereas food

5   manufacturers could make structure/function claims, manufacturers of dietary supplements could

6   not.  At that time, FDA treated dietary supplements that made structure/function claims as drugs

7   under the FDCA, believing that they did not qualify as "foods" under § 201(g)(1)(C) of the

8   statute.  *See Regulations on Statements Made for Dietary Supplements*, 63 Fed. Reg. 23624,

9   23624 (Apr. 29, 1998).  Congress, however, disagreed with FDA's position and enacted the

10  Dietary Supplement Health and Education Act of 1994 ("DSHEA"), Pub. L. No. 103-417, 108

11  Stat. 4325 (1994), which clarified that dietary supplements are "foods" under the FDCA and, as

12  such, may bear structure/function claims.  *See* Pub. Law. No. 103-417 § 6, 108 Stat. at 4329

13  (codified at 21 U.S.C. § 343(r)(6)); *see also* 65 Fed. Reg. at 1001, 1021-22, 1034; 103 S. Rep.

14  410 (noting that Congress, in enacting DSHEA, intended dietary supplements to be "subject to

15  regulation as a food").

16       In 2000, through formal notice-and-comment rulemaking, FDA adopted 21 C.F.R. §

17  101.93, which established definitive "criteria for determining whether a statement . . . is

18  acceptable as a structure/function claim."  65 Fed. Reg. at 1002; *see also id.* at 1008 ("The final

19  rule creates uniform, enforceable requirements for structure/function claims.").  Under this

20  regulation, a structure/function claim must state that a nutrient "helps maintain normal function"

21  of the body, but not "suggest treatment or prevention of a disease."  65 Fed. Reg. at 1015, 1018;

22  21 C.F.R. § 101.93(f)-(g).  FDA gave specific guidance on how this should be done, providing

23  the following examples (among others) of appropriate structure/function claims:

24  
- "helps promote digestion" (65 Fed. Reg. at 1006)
- "helps support cartilage and joint function" (*id.* at 1016-17)
25  
- "[m]aintains healthy lung function" (*id.* at 1018)
- "maintain[s] healthy circulation" (*id.* at 1022)
26  
- "supports the immune system" (*id.* at 1028-29)
- "supports the cardiovascular system" (*id.* at 1030)
27  

28  Of course, a structure/function claim must also be supported by evidence that the nutrient or

1    ingredient actually supports the normal structure or function of the body system referenced in the

2    claim.  *See* 65 Fed. Reg. at 1012; 21 U.S.C. § 343(r)(6)(B).  Provided that these conditions are

3    met, FDA regulations *affirmatively authorize* manufacturers to make such claims.

4            While the impetus for these regulations was the enactment of DSHEA, FDA's express

5    goal was to bring the regulatory scheme for dietary supplements in line with the existing "regime

6    for food," 65 Fed. Reg. at 1021, as Congress had intended.  *See also* 103 S. Rep. 410 ("[DSHEA]

7    builds upon current law" governing structure/function claims "by amending [the FDCA] to

8    amplify that nothing shall preclude . . . statements about how *a food, dietary ingredient, or*

9    *dietary supplement* affects the structure or any function of the body of man." (emphasis added));

10   *Food Labeling: Requirements for Nutrient Content Claims, Health Claims, and Statements of*

11   *Nutritional Support for Dietary supplements*, 62 Fed. Reg. 49859, 49861 (Sept. 23, 1997) (stating

12   that, in implementing regulations under DSHEA, "FDA is committed . . . to as much parity

13   between dietary supplements and conventional foods as is possible").  Thus, FDA has repeatedly

14   stated that it interprets "the dividing line between structure/function claims and disease claims"

15   essentially the same way "for conventional foods as for dietary supplements."  65 Fed. Reg. at

16   1034; *see also* FDA, *Structure/Function Claims*, http://www.fda.gov/Food/LabelingNutrition/

17   LabelClaims/StructureFunctionClaims/default.htm.[12]

18           **2.     McNeil's Structure/Function Claim Is Permitted By Federal Law**

19           The statement "with B vitamins To Help Support a Healthy Metabolism" on the label of

20   the B Vitamins Product is a paradigmatic structure/function claim.  The statement is worded in

21   precisely the manner approved by FDA, and there is nothing on the label that remotely suggests

22   that the B Vitamins Product is capable of treating or preventing any disease.  *Cf.* 65 Fed. Reg. at

23

24           [12] To the extent FDA treats structure/function claims for dietary supplements and for
25   conventional foods differently, FDA holds dietary supplements to a *higher* standard, and
     conventional foods to a lower one.  Specifically, FDA requires dietary supplement makers (1) to
26   submit to FDA written notice of their structure/function claims, and (2) to accompany
     structure/function claims with a disclaimer that "This statement has not been evaluated by the
27   Food and Drug Administration.  This product is not intended to diagnose, treat, cure, or prevent
     any disease."  *See* 65 Fed. Reg. at 1033; 21 C.F.R. § 101.93.  FDA has never imposed these
28   requirements on structure/function claims for conventional foods.  *See* 65 Fed. Reg. at 1033.

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION & MOTION TO DISMISS
PURSUANT TO FRCP12(B)(6)                    - 21 -                    CASE NO. 3:12-cv-04184-CRB

1029 (deeming "supports the immune system" to be a valid structure/function claim because it "conveys no specific reference to disease treatment or prevention" and "does not imply that a specific disease or class of diseases will be prevented").

Importantly, Plaintiffs do not dispute that B vitamins play a vital role in helping to "maintain normal function" of metabolic processes.  *Id.* at 1015; *see* CSPI, *Learn About Food Additives: Pyroxidine*, http://www.cspinet.org/reports/chemcuisine.htm#pyridoxine.  Nor could they in light of the substantial body of scientific evidence that B vitamins play a vital role in human metabolism.[13]  Instead, Plaintiffs allege that, according to a survey, some consumers misinterpret the statement that B vitamins "Help Support a Healthy Metabolism" to mean that B vitamins can lead to a "faster metabolism" and thereby promote weight loss.  (FAC ¶¶ 9, 18-21.)

FDA, however, has explicitly rejected the notion that the fate of a properly-worded, scientifically-accurate structure/function claim should depend on an empirical determination (based, *e.g.*, on "market research studies") "whether consumers are confused by th[e] claim."  65 Fed. Reg. at 1007-08.  In establishing uniform rules for structure/function claims, FDA expressly found that "it would be both impractical and inefficient . . . to decide the status of every possible [structure/function] claim" on the basis of ad hoc survey evidence.  *Id.*  Rather, relying on its "extensive experience," FDA concluded that structure/function claims should be assessed using the "objective standard" embodied in its regulations, which "strike[s] a reasonable balance" between (1) maximizing the free flow of important dietary and nutritional information and (2) protecting consumers from potentially misleading statements.  *Id.* at 1008, 1011.  In opting for a uniform standard, FDA acknowledged that "some of the claims considered to be structure/function claims" under its rule could conceivably imply "to some consumers" that a product provides different or greater benefits than is actually the case.  *Id.* at 1011.  But FDA's

---

[13] *See, e.g.*, Henry C. Lukaski, Ph.D., *Vitamin and Mineral Status: Effects on Physical Performance* at 633, *available at* http://naldc.nal.usda.gov/download/42756/PDF ("The B vitamins . . . regulate energy metabolism by modulating the synthesis and degradation of carbohydrate, fat, protein, and bioactive compounds."); Institute of Medicine, *Dietary Reference Intakes for Thiamin, Riboflavin, Niacin, Vitamin B6, Folate, Vitamin B12, Pantothenic Acid, Biotin, and Choline* (1998) at 10-11, *available at* https://download.nap.edu/catalog.php?record_id=6015 (noting the role of multiple B vitamins in human metabolism).

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION & MOTION TO DISMISS
PURSUANT TO FRCP12(B)(6)                    - 22 -                    CASE NO. 3:12-cv-04184-CRB

1    overriding interest in uniformity and consistency trumped this concern.

2        **3.    Plaintiffs' Claims Regarding The B Vitamins Product Are Preempted**

3        Plaintiffs' claims with respect to the B Vitamins Product are both expressly and impliedly

4    preempted.  As  noted above, the NLEA expressly preempts states from imposing non-identical

5    requirements concerning "any claim *of the type*" addressed in 21 U.S.C. § 343(r)(1).  21 U.S.C.

6    § 343-1(a)(5) (emphasis added).  Structure/function claims are claims "of the type" encompassed

7    by § 343(r)(1), as evidenced by the fact that 21 U.S.C. § 343(r)(6) states that structure/function

8    claims "may be made" in labeling for dietary supplements "for purposes of [§ 343](r)(1)(B)."[14]

9    States therefore are barred from imposing requirements on structure/function claims that differ

10   from federal law, and Plaintiffs' state-law claims challenging McNeil's FDA-compliant

11   structure/function claim for the B Vitamins Product are expressly preempted.

12       Plaintiffs' claims as to the B Vitamins Product are also barred by the doctrine of implied

13   conflict preemption.  Conflict preemption occurs whenever "state law stands as an obstacle to the

14   accomplishment and execution of the full purposes and objectives of Congress," or "interferes

15   with the methods by which the federal regulatory scheme was designed to reach its goal."

16   *Metrophones Telecomm., Inc. v. Global Crossing Telecomm., Inc.*, 423 F.3d 1056, 1072-73 (9th

17   Cir. 2005).  The NLEA's express preemption clause "does *not* bar the ordinary working of

18   conflict-preemption principles or . . . make it more difficult to establish the preemption of laws

19   falling outside the clause."  *See Arizona v. United States*, 132 S. Ct. 2492, 2504-05 (2012)

20   (emphasis in original); *see also* 136 Cong. Rec. S16607, S16611 (daily ed. Oct. 24, 1990)

21   (statement of Sen. Hatch) ("The decision of the Congress in [the NLEA] to specifically preempt

22   certain State or local requirements is not evidence, one way or the other, of any congressional

23   _____

24       [14] 21 U.S.C. § 343(r)(6) was added to the FDCA by DSHEA and expressly authorizes
     structure/function claims for dietary supplements.  Structure/function claims for foods are not
25   mentioned in § 343(r)(6) because, as detailed above, Congress believed that food manufacturers
     had the right to make structure/function claims under the FDCA even before DSHEA was
26   enacted.  Indeed, the entire purpose of DSHEA was to bring the regulatory regime governing
     dietary supplements into parity with foods.  Nevertheless, Congress's acknowledgement in §
27   343(r)(6) that dietary supplement makers may make structure/function claims "for purposes of"
     § 343(r)(1)(B) indicates that Congress considers structure/function claims to be claims "of the
28   type" governed by § 343(r)(1).

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION & MOTION TO DISMISS
PURSUANT TO FRCP12(B)(6)                - 23 -              CASE NO. 3:12-cv-04184-CRB

1  view about the existence of preemption which may arise from other existing legal authorities or

2  actions.").

3       Here, acting at Congress's direction, FDA promulgated "uniform" and "objective" rules to

4  guide manufacturers in crafting structure/function claims.  65 Fed. Reg. at 1008.  Doing so

5  required FDA to "strike a reasonable balance between the[] competing goals" of protecting

6  consumers from misleading statements on one hand, and maximizing the free flow of important

7  dietary and nutritional information on the other hand.  65 Fed. Reg. at 1011.  The doctrine of

8  conflict preemption bars Plaintiffs from asking a court or jury to upend FDA's carefully

9  calibrated scheme.  *See Metrophones*, 423 F.3d at 1078; *accord Aurora Dairy Corp. Organic*

10  *Milk Mktg. & Sales Practices Litig.*, 621 F.3d 781, 796-97 (8th Cir. 2010) ("[Congress's]

11  purpose, 'to establish national standards governing the marketing of [organic products],' would

12  be deeply undermined by the inevitable divergence in applicable state laws as numerous court

13  systems [make] . . . conflicting [decisions].").  As the Third Circuit recently explained:

> The Supreme Court's preemption case law indicates that regulatory
> situations in which an agency is required to strike a
> balance between competing statutory objectives lend themselves to a
> finding of conflict preemption. . . . When Congress charges an
> agency with balancing competing objectives, it intends the agency
> to use its reasoned judgment to weigh the relevant considerations
> and determine how best to prioritize between these objectives.
> Allowing state law to impose a different standard permits a re-
> balancing of those considerations.  A state-law standard that is more
> protective of one objective may result in a standard that is less
> protective of others.

20  *Farina v. Nokia, Inc.*, 625 F.3d 97, 123 (3d Cir. 2010) (emphasis added), *cert. denied*, 132 S. Ct.

21  365 (2011) (collecting cases).  Plaintiffs' claims concerning the B Vitamins Product are impliedly

22  preempted for these same reasons.

23  **II.**     **Plaintiffs' Claims Are Barred By The Safe Harbor Doctrine**

24       Plaintiffs' state-law claims concerning all three Products fail for another reason: labeling

25  practices expressly permitted by FDA regulations are shielded from attack under state law by the

26  doctrine of safe harbor.  *See Turek*, 662 F.3d at 427 (holding that plaintiff "fail[ed] to state a

27  claim" under state consumer-protection law because safe harbor protects conduct "authorized by

28  the [FDCA] and [FDA] regulations").

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION & MOTION TO DISMISS
PURSUANT TO FRCP12(B)(6)     - 24 -     CASE NO. 3:12-cv-04184-CRB

The safe harbor doctrine recognizes that, in deference to other branches of government, a court cannot punish a party for engaging in a practice expressly permitted by law.  Most states have codified the safe harbor defense in their consumer protection statutes.  In other states where the defense is not codified, including California, courts recognize it as a matter of common law.  The California Supreme Court has explained the safe harbor doctrine as follows:

> Although the [UCL's] scope is sweeping, it is not unlimited.
> Courts may not simply impose their own notions of the day as to
> what is fair or unfair.  Specific legislation may limit the judiciary's
> power to declare conduct unfair.  If the Legislature has permitted
> certain conduct or considered a situation and concluded no action
> should lie, courts may not override that determination.

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 182 (1999).[15]

California courts have recognized that the safe harbor defense can be triggered by legislation or regulations, whether state or federal.  *See Davis v. HSBC Bank*, 691 F.3d 1152, 1165-66 & n.3 (9th Cir. 2012) (collecting cases).  Where, as here, the disputed practice is one permitted by *federal* law, the doctrine serves the additional purpose of ensuring national "uniformity in the regulation of advertising and labeling and a deference to the expertise of the responsible regulatory agency." *Am. Home Prods. Corp. v. Johnson & Johnson*, 672 F. Supp. 135, 144 (S.D.N.Y 1987); *see also Alvarez v. Chevron Corp.*, 656 F.3d 925, 935 (9th Cir. 2011).

As detailed above, each of the challenged statements on the Products' labels is expressly condoned by FDA regulations directly on point.  Plaintiffs are free to lobby Congress or FDA to change these rules.  *See PhotoMedex, Inc. v. Irwin*, 601 F.3d 919, 929 (9th Cir. 2010) (plaintiff "should be forced to take its argument to the [appropriate agency]"); *Am. Home Prods.*, 672 F. Supp. at 145 ("[t]here is no apparent reason why [plaintiff] cannot ask the FDA to reconsider" its rule).  But Plaintiffs are barred by the doctrine of safe harbor from asking a court to do so.

---

[15] Although *Cel-Tech* addressed the UCL's "unfair" prong, the safe harbor doctrine also bars claims under the UCL's other prongs, as well as the FAL and the CLRA.  *See, e.g.*, *Alvarez v. Chevron Corp.*, 656 F.3d 925, 932-34 (9th Cir. 2011) (UCL unlawful and deceptive prongs and CLRA); *Lopez v. Nissan N. Am., Inc.*, 201 Cal. App. 4th 572, 576, 590-96 (2011) (UCL unfair and deceptive prongs, FAL, and CLRA).

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION & MOTION TO DISMISS
PURSUANT TO FRCP12(B)(6)                - 25 -                CASE NO. 3:12-cv-04184-CRB

III.   **The FAC Fails To State A Viable Claim For Relief Under California Law**

Even if there were no federal preemption and California's safe harbor doctrine did not apply, Plaintiffs' claims still would fail for each of several reasons.

A.   **McNeil's Labeling Is Truthful And Not Misleading As A Matter Of Law**

"Whether an advertisement is 'misleading' must be judged by the effect it would have on a reasonable consumer." *Davis*, 691 F.3d at 1161-62.[16]  A reasonable consumer is "not just any consumer[]," *Hill v. Roll Int'l Corp.*, 195 Cal. App. 4th 1295, 1304 (2011), but "the ordinary consumer acting reasonably under the circumstances." *Davis*, 691 F.3d at 1162; *see also Freeman v. Time, Inc.*, 68 F.3d 285, 289-90 (9th Cir. 1995) (advertisers "may expect [consumers] to behave reasonably").  The relevant standard is "not a least sophisticated consumer" or an "unwary consumer." *Hill*, 195 Cal. App. 4th at 1304.  To prevail, a plaintiff must establish that *ordinary* consumers "are *likely* to be deceived by the advertisement," *Davis*, 691 F.3d at 1162 (emphasis added), and "[t]he term 'likely' means probable, not just possible," *McKinniss v. Gen. Mills, Inc.*, 2007 U.S. Dist. LEXIS 96107, at *10 (C.D. Cal. Sept. 18, 2007) (*McKinniss II*).

Accordingly, courts applying California law routinely dismiss claims on the pleadings where the plaintiff's interpretation of an advertisement is "illogical," *Rosen v. Unilever U.S., Inc.*, 2010 U.S. Dist. LEXIS 43797, at *14-17 (N.D. Cal. May 3, 2010), "strains credulity," *Carrea*, 2012 U.S. App. LEXIS 6851, at *4, or "defies common sense," *Davis*, 691 F.3d at 1162; where the disputed statements are typical commercial "puffery" on which "no reasonable consumer [would] rel[y]," *Haskell v. Time, Inc.*, 857 F. Supp. 1392, 1399 (E.D. Cal. 1994); or where the plaintiff's allegations otherwise fail to establish that ordinary consumers acting reasonably are likely to be deceived.  *See, e.g., Baltazar v. Apple, Inc.*, 2011 U.S. Dist. LEXIS 96140, at *16-17 (N.D. Cal. Aug. 26, 2011); *Dvora*, 2011 U.S. Dist. LEXIS 55513, at *15-22; *Carrea*, 2011 U.S. Dist. LEXIS 6371, at *14-18; *Werbel v. Pepsico, Inc.*, 2010 U.S. Dist. LEXIS 76289, at *8-9

---

[16] False advertising claims are analyzed under the "reasonable consumer" standard whether asserted under the UCL, FAL, or CLRA.  *See, e.g., Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008); *Freeman v. Time, Inc.*, 68 F.3d 285, 287-90 (9th Cir. 1995); *Baltazar v. Apple, Inc.*, 2011 U.S. Dist. LEXIS 96140, at *16-17 (N.D. Cal. Aug. 26, 2011); *Carrea*, 2011 U.S. Dist. LEXIS 6371, at *14.

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION & MOTION TO DISMISS
PURSUANT TO FRCP12(B)(6)                    - 26 -                    CASE NO. 3:12-cv-04184-CRB

1   (N.D. Cal. July 1, 2010); *Videtto v. Kellogg USA*, 2009 U.S. Dist. LEXIS 43114, at *6-9 (E.D.

2   Cal. May 21, 2009); *McKinniss II*, 2007 U.S. Dist. LEXIS 96107, at *9-*17; *McKinniss I*, 2007

3   U.S. Dist. LEXIS 96108, at *7-13.

### 1.    The "Splenda Essentials" Name

5          Plaintiffs allege that the word "essential" in the Splenda Essentials name "cues consumers

6   to think this product is a *necessity*."  (FAC ¶¶ 5, 16 (emphasis in original).)  This is not a

7   reasonable interpretation.  Indeed, none of the Plaintiffs allege that, at the time of their purchases,

8   they themselves believed the Products were *required* for human health.  At most, the Splenda

9   Essentials name suggests that the Products contain essential *nutrients* — vitamins B, C, and E and

10  dietary fiber — a proposition that is true and not legitimately open to dispute.[17]

11         In any event, as a matter of law, the Splenda Essentials name is non-actionable puffery.

12  Courts have described puffery at various times as (1) "a general claim of superiority over

13  comparable products that is so vague that it can be understood as nothing more than a mere

14  expression of opinion," *Pizza Hut, Inc. v. Papa John's Int'l, Inc*., 227 F.3d 489, 497 (5th Cir.

15  2000); (2) an "exaggerated . . . , blustering, and boasting [statement] upon which no reasonable

16  buyer would rely," *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1145 (9th Cir.

17  1997); or (3) "vague, highly subjective claims as opposed to specific, detailed factual assertions,"

18  *Sanders v. Apple, Inc.,* 672 F. Supp. 2d 978, 987 (N.D. Cal. 2009).  Under any of these

19  formulations, a statement that a product is "essential" is prototypical puffery.  *See, e.g.*, *McKinney*

20  *v. Google, Inc.*, 2011 U.S. Dist. LEXIS 97958, at *18-19 (N.D. Cal. Aug. 30, 2011) (advertiser's

21  claim that a cell phone is "essential for web surfing and email" is puffery); *Whiting v. AARP*, 701

22  _____

23         [17] *See* FDA, *Dietary Supplements - Import and Domestic*, Attachment B, http://www.fda.gov/Food/GuidanceComplianceRegulatoryInformation/ComplianceEnforcement/ucm071547.htm (including fiber, vitamin C, vitamin E, and the B vitamins in a "Table of

24  Essential Nutrients"); FDA, *Fortify Your Knowledge About Vitamins*, http://www.fda.gov/ForConsumers/ConsumerUpdates/ucm118079.htm (stating that "[v]itamins

25  are essential nutrients" and that "the body absolutely needs[] vitamins A, C, . . . and the B vitamins"); *Food Labeling: Nutrient Content Claims, Definition of Term: Healthy*, 59 Fed. Reg.

26  24232, 24243 (May 10, 1994) (describing vitamin A, vitamin C, and fiber as "essential nutrients" which "have been highlighted by leading health authorities as being important to the public

27  health"); 21 C.F.R. § 101.9(c)(8)(iv) (listing vitamins C, E, and the B vitamins as "essential in human nutrition").

28

F. Supp. 2d 21, 30 n.7 (D.D.C. 2010) (statement that insurance policy provides "essential health benefits" is puffery).  Plaintiffs' attack on the Splenda Essentials name must therefore be dismissed.

### 2.     The Antioxidants Product

Plaintiffs allege that the packaging of the Antioxidants Product is misleading for two reasons.  First, Plaintiffs assert that the word "antioxidants" coupled with images of fruit on the product label suggests that the product's antioxidants are derived from real fruit and/or provide all the health benefits associated with consuming real fruit.  (FAC ¶¶ 10, 23.)  Second, Plaintiffs allege that the labeling implies that the product helps prevent disease, has anti-bacterial properties, prevents colds, and may prevent cancer.  (FAC ¶ 25.)  Neither interpretation is plausible as a matter of law.

No reasonable consumer viewing the Antioxidants Product's package would assume, based solely on the pictures of fruit, that the product contains, or is derived from, real fruit.  Indeed, California courts have already recognized that the mere "depiction of fruit on a product label" is not an automatic "affirmation that a product contains a particular amount of fruit," or indeed, "*any fruit at all*."  *McKinniss I*, 2007 U.S. Dist. LEXIS 96108, at *11 (emphasis in original); *see also McKinniss II*, 2007 U.S. Dist. LEXIS 96107, at *12 (same); *Videtto*, 2009 U.S. Dist. LEXIS 43114, at *6-9 (dismissing on pleadings an implausible false-advertising claim involving images of fruit).

Moreover, when assessing how consumers are likely to interpret a label, a court must consider the "label as a whole."  *McKinniss I*, 2007 U.S. Dist. LEXIS 96108, at *11.  The Antioxidants Product's PDP depicts two packets of Splenda Essentials next to cut and prepared fruits, as well as a cup of coffee and a bowl of cereal — foods that reasonable consumers know are routinely sweetened with no-calorie sweeteners.  *See Green*, 2005 WL 3388158, at *2 ("Splenda packets are generally used to sweeten beverages, sprinkle on cereal or fruit, or otherwise to sweeten foods before they are eaten.").  Indeed, Plaintiffs themselves purchased and used the Products for precisely these purposes (*See* FAC ¶ 8 (Plaintiffs "used . . . Splenda Essentials to sweeten foods like coffee, yogurt, and cereal").)  And the labels of the other two

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION & MOTION TO DISMISS
PURSUANT TO FRCP12(B)(6)                    - 28 -                    CASE NO. 3:12-cv-04184-CRB

1   Splenda Essentials Products similarly feature images of fruit, coffee and cereal — as do the labels

2   of regular Splenda brand no-calorie sweetener[18] and other competing products.  *See McNeil-PPC,*

3   *Inc. v. Merisant Co.*, 2004 WL 3316380, at *1 (D.P.R. July 29, 2004) ("Equal, the best selling

4   aspartame brand, is distributed . . . in a distinctive blue box that features a large red strawberry on

5   the front panel.").  As a matter of law, a reasonable consumer would therefore understand the

6   image on the PDP of the Antioxidants Product as a serving suggestion or illustration of how the

7   product is used — not a claim about the source from which its antioxidants are derived.

8           Nor would a reasonable consumer infer from the label that the Antioxidants Product will

9   reduce their risk of cardiovascular disease, cancer, cognitive decline, or any other disease.  The

10  label makes no statement to that effect — it merely notes that antioxidant vitamins C and E are

11  present in the product.  And as noted above, FDA has expressly rejected the notion that the mere

12  mention of antioxidants implies that a product treats or prevents some specific disease.

13          **3.      The Fiber Product**

14          Plaintiffs allege that the packaging of the Fiber Product is misleading because it "features

15  foods rich in intact fiber, such as strawberries, apples with their skin intact, and cereal with dark

16  (presumably whole) grains," thereby "giv[ing] consumers the impression that they are receiving

17  the same health benefits as they would from fibers found in whole foods."  (FAC ¶ 27.)

18          As with the Antioxidants Product, a reasonable consumer would understand that the

19  pictures on the PDP of the Fiber Product are illustrations of how to use the product, not a

20  representation that the product contains the same nutrients or provides the same health benefits as

21  the depicted foods.  The PDP of the Fiber Product shows two packets of Splenda Essentials next

22  to a cut strawberry, two apple slices, a bowl of cereal and a cup of coffee.  Contrary to Plaintiffs'

23  allegation, the bowl of cereal on the Fiber Product is not unusually "dark" and therefore

24  "presumably whole[] grain."  Rather, as the Court can see for itself, it is essentially identical to

25

26          [18] *See* http://www.splendastore.com/category/getsplenda/packets.do?nType=2; (Ex. D to
    McNeil's Req. for Judicial Notice).  The Court may take judicial notice of the regular Splenda

27  label because footnote 5 of the FAC directs the Court to a web page where an image of that
    product appears.  *See Davis*, 691 F.3d at 1160.

28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION & MOTION TO DISMISS
PURSUANT TO FRCP12(B)(6)                    - 29 -                    CASE NO. 3:12-cv-04184-CRB

the bowls of cereal depicted on the other two Splenda Essentials products, and on the label of regular Splenda no-calorie sweetener. (*See* Exs. A-D to McNeil's Req. for Judicial Notice.) There is no reason to think that ordinary consumers will assume that the cereal shown on the Fiber Product signifies "natural" fiber, whereas the cereal on the other Splenda products does not. The same is true of the strawberry, which also appears on the PDP of the Antioxidants Product and on the labels of other no-calorie sweeteners. *See McNeil*, 2004 WL 3316380, at *1.

### 4.   The B Vitamins Product

Plaintiffs allege that the packaging of the B Vitamins Product is misleading because the statement "with B Vitamins to Help Support a Healthy Metabolism" implies that the product will "give [consumers] a '*faster* metabolism'" and cause "weight loss." (FAC ¶ 9 (emphasis added).)

An ordinary consumer acting reasonably under the circumstances would not equate "Help[s] Support a Healthy Metabolism" — a structure/function claim of the sort permitted by FDA — with an assurance of a "faster metabolism," let alone of weight loss. Indeed, in a recent false-advertising case, a California court found as a matter of law that a claim that a soft drink would "[b]urn up to 100 calories . . . [per] can" could not reasonably be construed as a "promise that consumption of the product would result in weight loss." *Fletcher v. Celsius Holdings, Inc.*, No. BC439 055 (Cal. Sup. Ct. Los Angeles Cnty. Sept. 1, 2012) (Ex. F to McNeil's Req. for Judicial Notice), slip op. at 9-11, 18. The structure/function claim at issue here is far less susceptible to being interpreted as a weight-loss claim than the statement in *Fletcher*.

Moreover, insofar as Plaintiffs were left with an impression that the B Vitamins Product as a whole is useful in maintaining or losing weight, that message is indisputably true. Each packet of the B Vitamins Product provides the same sweetness as two teaspoons of sugar, but without the calories. (*See* Ex. C to McNeil's Req. for Judicial Notice.) Accordingly, the B Vitamins Product, like other Splenda products, is ideal for consumers who are dieting or trying to maintain their weight.

### B.   Lack Of Scientific Substantiation Does Not Constitute False Advertising

Even assuming that consumers interpret the Products' labels in the manner alleged, Plaintiffs do not contend that these purportedly implied messages are *false*. Rather, Plaintiffs'

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION & MOTION TO DISMISS
PURSUANT TO FRCP12(B)(6)                - 30 -                CASE NO. 3:12-CV-04184-CRB

theory is that these supposedly implied claims are unlawful because there is an "absence of reliable scientific evidence" to support them, so they "fall[] short of satisfying the Federal Trade Commission's substantiation requirements" for "health-related" claims.  (FAC ¶ 14.)

"[T]he case law is clear," however, that "prior substantiation claims" — allegations that an advertiser's statements are inadequately substantiated — "are not cognizable under the . . . UCL, FAL, or CLRA."  *Scheuerman v. Nestle Healthcare Nutrition*, 2012 U.S. Dist. LEXIS 99397, at *21-22 (D.N.J. July 17, 2012) (collecting cases).  As a matter of law, an alleged "absence of [adequate] substantiation" is insufficient to establish "falsity" or show that the advertisement is "somehow misleading."  *Chavez v. Nestle USA, Inc.*, 2011 U.S. Dist. LEXIS 58733, at *15-16 (C.D. Cal. May 2, 2011).

The reason for this is simple.  "[T]he government, representing the Federal Trade Commission, can sue an advertiser for making unsubstantiated advertising claims."  *Fraker v. Bayer Corp.*, 2009 U.S. Dist. LEXIS 125633, at *21 (E.D. Cal. Oct. 2, 2009).  But California law requires more of "a private plaintiff."  *Id.*  A private plaintiff must plead, and ultimately prove, that a defendant's "advertising claims . . . are *actually false*[,] not simply that they are not backed up by scientific evidence."  *Id.* at *22 (emphasis added); *see also Stanley v. Bayer Healthcare LLC*, 2012 U.S. Dist. LEXIS 47895, at *8-10 (S.D. Cal. Apr. 3, 2012); *Nat'l Council Against Health Fraud, Inc. v. King Bio Pharms., Inc.*, 107 Cal. App. 4th 1336, 1345 (2003).

Plaintiffs sprinkle conclusory references to "false," "deceptive," and "misleading" throughout the FAC.  But as Plaintiffs well know, such bare-bones assertions are insufficient under *Iqbal and Twombly.*  Plaintiffs' effort to satisfy their pleading obligations rests instead on their "absence of reliable scientific evidence" theory.  Thus, with respect to the Antioxidants Product, Plaintiffs allege that "clinical trials have not tested the impact of fruits and vegetables on the risk" of various diseases (FAC ¶ 24) and that "large-scale clinical trials have failed to find" that antioxidant vitamins reduce disease.  (*Id.* ¶ 23.)  With respect to the Fiber Product, Plaintiffs allege that "there is no scientific consensus that refined fibers function like intact fibers" and that "research [on the subject] is inconclusive."  (*Id.* ¶¶ 26, 28.)  And with respect to the B Vitamins Product, Plaintiffs allege that "[n]o reliable studies" have "show[n] that B vitamin

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION & MOTION TO DISMISS
PURSUANT TO FRCP12(B)(6)                    - 31 -                    CASE NO. 3:12-cv-04184-CRB

1  supplementation promotes weight loss." (*Id.* ¶ 20.)  Such allegations do not state a viable claim

2  under California law.

3  **C.   Plaintiffs' Claims Concerning McNeil's Non-Label Advertising Are Legally Barred And Factually Deficient**

4

5       In addition to the Products' packaging, Plaintiffs take issue with various statements on the

6  Products' websites and a print advertisement for the B Vitamins Product.  These claims must be

7  dismissed for two independent reasons.

8       First, insofar as McNeil's website and print advertisement merely repeat statements that

9  FDA regulations permit to be made on product labeling, they are protected by the preemption and

10  safe harbor doctrines.  *See Andrus v. AgrEvo USA Co.*, 178 F.3d 395, 400 (5th Cir. 1999) ("when

11  advertising or promotional materials merely repeat information or language contained in the label,

12  claims directed at the advertising necessarily challenge the label itself and are therefore

13  preempted"); *Prohias v. AstraZeneca Pharms., L.P.*, 958 So. 2d 1054, 1056 (Fla. Ct. App. 2007)

14  ("promotional and advertising activity" entitled to same safe harbor as "FDA-approved

15  labeling"); *N.J. Citizen Action v. Schering-Plough Corp.*, 842 A.2d 174, 177 (N.J. App. Div.

16  2003) (where the "products in question remain subject to the strict regulation of the FDA," the

17  safe harbor doctrine dictates that the "wording of the ads" is "not actionable").  As these cases

18  recognize, it would undermine FDA's authority and thwart the goal of national uniformity if

19  manufacturers could be held liable merely for repeating in their advertisements label statements

20  that FDA requires or permits.[19]  Moreover, as a practical matter, manufacturers must be free to

21  show their FDA-compliant product labels in advertisements and to describe their products

22  consistently in labeling and advertising.

23       Second, Plaintiffs' attack on McNeil's non-label advertising suffers from a more

24  ─────────────────

25       [19] FDA has authority over labeling as well as any "accompanying" material used in the distribution and sale of FDA-regulated products.  *See* 21 U.S.C. § 321(m).  Courts have construed "accompanying" broadly and held that FDA's authority extends to non-label advertising,

26  including product websites.  *See Kordel v. United States*, 335 U.S. 345, 350 (1948); *Bober v. Glaxo Wellcome, PLC*, 1999 U.S. Dist. LEXIS 14724, at *4-5 (N.D. Ill. Sept. 3, 1999); Hutt,

27  *Regulation of Health Claims* at 26 ("promotional material associated with the product at virtually any point in its marketing" subject to FDA's authority).

28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION & MOTION TO DISMISS
PURSUANT TO FRCP12(B)(6)            - 32 -            CASE NO. 3:12-cv-04184-CRB

fundamental problem: none of the Plaintiffs alleges that he or she ever visited the Products' websites or saw any print ad for the Products prior to purchasing them.  In California, it is well-established that plaintiffs cannot dispute statements in advertising materials that they never saw.  Some courts have held that plaintiffs lack *standing* to challenge such ads.  *See, e.g.*, *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 595 (9th Cir. 2012).  Other courts have determined that plaintiffs cannot prove they were injured "as a result of" ads they did not see.  *See, e.g.*, *In re Facebook, Inc., PPC Ad. Litig.*, 282 F.R.D. 446, 460-61 (N.D. Cal. 2012).  Under either rationale, Plaintiffs' failure to allege that they saw any of the disputed websites or advertisements is fatal to their claims.  *See Dvora*, 2011 U.S. Dist. LEXIS 55513, at *21 ("While [Plaintiff] attempts to buttress [his] claim with statements from the Total website, Plaintiff . . . never read or relied upon such statements in making his purchase."); *Chavez v. Nestle USA, Inc.*, 2011 U.S. Dist. LEXIS 9773, at *13 (C.D. Cal. Jan. 10, 2011) (where plaintiffs "d[id] not identify any specific ad[s]" they saw, "any claim in the [complaint] . . . must be based solely on the . . . products' packaging and labeling statements").[20]

### D.  Plaintiffs' Implied Warranty Of Merchantability And Unjust Enrichment Claims Are Not Legally Viable

Finally, Plaintiffs' implied warranty of merchantability and unjust enrichment claims are legally defective and must be dismissed.

Plaintiffs' implied warranty claim fails because the FAC's allegations do not plausibly establish that the Products were nonmerchantable.  To be "merchantable," goods must be "fit for the ordinary purpose for which such goods are used."  *Birdsong v. Apple, Inc.*, 590 F.3d 955, 958 (9th Cir. 2009) (quoting Cal. Com. Code § 2314(2)(c)).  Merchantability "does not 'impose a general requirement that goods precisely fulfill the expectation of the buyer.  Instead, it provides for a minimum level of quality.'"  *Kent v. Hewlett-Packard Co.*, 2010 WL 2681767, at *4 (N.D. Cal. July 6, 2010); *see also Birdsong*, 590 F.3d at 958 (product is nonmerchantable only if it

---

[20] Even if the FAC could be charitably construed to allege that Plaintiffs saw these statements, its allegations still fall woefully short of Rule 9(b)'s particularity requirement.  *See Briseno*, 2011 U.S. Dist. LEXIS 154750, at *29-41.

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION & MOTION TO DISMISS
PURSUANT TO FRCP12(B)(6)                    - 33 -                    CASE NO. 3:12-cv-04184-CRB

1    "lacks even the most basic degree of fitness for ordinary use").  Plaintiffs essentially concede that

2    the Products were "fit for the ordinary purpose" for which people buy no-calorie sweeteners

3    because they acknowledge that they used multiple packets per day to sweeten foods and

4    beverages.  The Products' purported failure to provide the health benefits that Plaintiffs claim

5    they subjectively inferred from the labels does not render the Products nonmerchantable.[21]

6         Plaintiffs' unjust enrichment claim fails because "unjust enrichment is not an independent

7    cause of action in California."  *Smith v. Ford Motor Co.*, 462 F. App'x 660, 665 (9th Cir. 2011);

8    *see also Berenblat v. Apple, Inc.*, 2009 U.S. Dist. LEXIS 80734, at *18-19 (N.D. Cal. Aug. 21,

9    2009); *Jogani v. Superior Court*, 165 Cal. App. 4th 901, 911 (2008).

10   / / /

11   / / /

12   / / /

13   / / /

14   / / /

15   / / /

16   / / /

17   / / /

18   / / /

19   / / /

20   / / /

21   / / /

22   / / /

23   _____

24   [21] While fitness for ordinary use is "[t]he core test for merchantability," *Harlan v. Roadtrek Motorhomes, Inc.*, 2009 U.S. Dist. LEXIS 29169, at *23-24 (S.D. Cal. Apr. 2, 2009), goods are also considered nonmerchantable if they do not "[c]onform to [any] promises or

25   affirmations of fact made on the container or label."  Cal. Com. Code § 2314(2)(f).  Plaintiffs cite this provision (FAC ¶¶ 85-86), but they do not allege that any express "promise" or "affirmation[]"

26   of fact" on the packaging of the Products is false.  *Cf. Hauter v. Zogarts*, 14 Cal. 3d 104, 117-18 (Cal. 1975).  Rather, Plaintiffs allege that the Products' labeling is deceptive because, viewed

27   holistically, it *implies* certain health benefits that are not scientifically substantiated.  No case recognizes a lack of merchantability based solely on such allegedly implied representations.

28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION & MOTION TO DISMISS
PURSUANT TO FRCP12(B)(6)                - 34 -              CASE NO. 3:12-cv-04184-CRB

1

## **CONCLUSION**

2      The FAC is an improper attempt to challenge, through a private action under state law,

3  food labeling statements that are expressly permitted by a federal statute and its implementing

4  regulations.  The Court should dismiss the FAC, in its entirety, with prejudice.

5  Dated: October 30, 2012                    DRINKER BIDDLE & REATH LLP

6

7                                            By:/s/ Michael J. Strotz

8                                               Michael J. Stortz

9                                            Attorneys for Defendants

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF MOTION & MOTION TO DISMISS
PURSUANT TO FRCP12(B)(6)                - 35 -          CASE NO. 3:12-cv-04184-CRB