Pages 1 - 29

                    UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF CALIFORNIA
             BEFORE THE HONORABLE CHARLES R. BREYER, CHIEF JUDGE

BARBARA BRONSON, et al.,          )
                                  )
            Plaintiffs,            )
                                  )
  VS.                             ) NO. C 12-4184 CRB
                                  )
JOHNSON & JOHNSON, et al.,        )
                                  )  San Francisco, California
            Defendants.           )  Friday
                                  )  April 12, 2013
_____  )  10:46 a.m.


                       TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiffs:          CENTER FOR SCIENCE
                            IN THE PUBLIC INTEREST
                         5646 Milton Street
                         Suite 714
                         Dallas, Texas  75206
                    BY:  STEPHEN GARDNER, ESQ.
                         and
                         THE MILLS LAW FIRM
                         880 Las Gallinas Avenue
                         Suite 2
                         San Rafael, California  94903
                    BY:  ROBERT W. MILLS, ESQ.


For Defendants:          PATTERSON BELKNAP WEBB & TYLER LLP
                         1133 Avenue of the Americas
                         New York, New York  10036
                    BY:  STEVEN A. ZALESIN, ESQ.
                         and
                         DRINKER BIDDLE & REATH LLP
                         50 Fremont Street
                         20th Floor
                         San Francisco, California  94105-2235
                    BY:  MICHAEL J. STORTZ, ESQ.


Reported by:             BELLE BALL, CSR #8785, CRR, RDR
                         Official Reporter, U.S. District Court

```
 1  FRIDAY, APRIL 12, 2013                        10:46 A.M.

 2                      P R O C E E D I N G S

 3         THE CLERK:  Calling Case C 12-4184, Barbara Bronson

 4  versus Johnson & Johnson.  Appearances, Counsel.

 5         MR. GARDNER:  Good morning, Your Honor.  Steve

 6  Gardner for the Plaintiffs.  With me is Robert Mills.

 7         MR. MILLS:  Good morning, Your Honor.

 8         MR. GARDNER:  But, I'll be mouthing it.

 9         MR. ZALESIN:  And good morning, Your Honor.  Steve

10  Zalesin for the Defendants.  And with me is Michael Stortz.

11         THE COURT:  All right.  Well, there are a lot of

12  issues in this.  And I actually thought it would be useful for

13  me to write something as -- you know, as to my conclusions with

14  respect to the various claims that are raised.

15      However, I did want to ask this question, because while

16  not exclusively, in significant part, the Plaintiffs' case

17  rests on a lack-of-substantiation claim.  Namely, that certain

18  things are said in -- in the literature, the campaign -- even

19  its broadest aspects, one has to get -- talk about labeling

20  versus ad campaign versus this versus that.

21      But essentially what the Plaintiff has maintained here --

22  not exclusively, but in part -- was that certain statements are

23  made for which there is no substantiation.  Not that they're

24  necessarily false, but that they had no good-faith belief in

25  the truth of the statements.  That is to say, they don't have
```

1  evidence that would substantiate the types of claims that they

2  made.  That looked to me to be what most of this case is about.

3       So, to say it's a false -- under the rubric of false

4  advertising, you can say a lot of things are false advertising.

5  If I said, if I say "This" -- you know, it can be a -- a

6  mis- -- it could be a lie, saying something which you know is

7  not true based upon the knowledge that either you had or could

8  have had at the time.  Or, it can be neither true or false, but

9  simply we don't -- you can't make that statement unless you

10 have evidence in support of that statement.

11      Okay.  I mean -- okay.  So, is that correct?  Or have I

12 missed it?

13           MR. GARDNER:  In part, Your Honor --

14           THE COURT:  In large part.  In large part.

15           MR. GARDNER:  The fundament of the claim is that the

16 claims are, in fact, false because the implied claims -- and

17 these are largely implied -- cannot -- are not proveable.

18 There is not scientific support for these claims.

19           THE COURT:  So that is the falsity.

20           MR. GARDNER:  And a deception as well, both under the

21 UCL, the CLRA, and bootstrapping in the Sherman law, which is

22 identical to the federal law that we're suing, bootstrapping in

23 the California law.  Under the FDA requirements, you can't be

24 false or misleading in any particular.

25      It is also true that they don't have substantiation, but

4

1   that's almost the flip side of what we are saying, that these

2   are deceptive claims --

3           **THE COURT:**  I don't know that it's a flip side.  I

4   think -- I think it follows -- your argument is it follows as

5   night to day.  I think it's on the same side.

6       I can take an example.  I can say, "This product will make

7   you young."  So, like that.  I'd probably take it, in that

8   case.  "Will make you young."

9       And so you sue them, and you say, "It's false.  It will

10  not make you young."

11      How do you know it would not make you young?  And you say

12  -- and the other side says, "Well, we don't know whether it

13  will or not.  We think it will.  We're making it -- but,

14  possible that it won't.  But we don't know."

15      So, that's called a lack of substantiation.  They do not

16  have evidence which shows that it will make you young, the

17  person who consumes it.

18      Or, there could be a body of evidence out there that says,

19  "Take this pill, 'it will make you old."  So, that's an

20  example.

21      But, both of them are examples of false statements.  One

22  is an example of lack of substantiation, and one is an example

23  of -- where clearly the defendant knew that the opposite was

24  true, or some variation of the opposite.  Those are two types

25  of falsity.

```
 1        And what I'm saying is what I understand your case to be
 2   for the most part is a lack of substantiation.  That is, they
 3   made these statements without a basis in fact of believing --
 4   of knowing that they were true, at the time that they made
 5   these statements.  True and accurate.
 6        MR. GARDNER:  I won't directly address that,
 7   Your Honor, because the reason I'm being careful here is there
 8   is some California authority that says it is not intrinsically
 9   a violation of the UCL or the CLRA to fail to have adequate
10   substantiation.  That's a Federal Trade Commission law, only.
11        I don't believe those cases are correct, because under the
12   UCL, a plaintiff can borrow from federal statutes, as well,
13   including the FTC Act, Section 5.  So, we could bootstrap in
14   the failure to substantiate.
15        And I'm trying to avoid that for the -- so that the Court
16   does not have to get to the question as to whether failure to
17   have prior substantiation is, in and of itself, a violation of
18   California law.
19        THE COURT:  Okay, so you argue that -- that under the
20   law, the California law which is incorporated, it's okay to
21   have a lack of substantiation; it still is a viable claim.
22        MR. GARDNER:  I'm arguing that -- courts have said
23   that.  I believe those courts to be incorrect, for the reason
24   I've just said.  I think that when you make a representation
25   without any clue as to whether it's true or not, people are
```

1   entitled to rely on the representation.  These are things known

2   as what are usually called "credence goods."

3        This is not in our brief, but Judge Posner wrote, just --

4   one of his, you know, 2- to 3,000 books, he wrote about

5   credence goods, which are consumer goods that the consumer

6   cannot know of their own accord whether or not the claims are

7   true.  They cannot know that an antioxidant will have any

8   antioxidant effect, whatsoever, or an antioxidant effect

9   similar to fruits and vegetables.  They have to rely on what

10  the defendant has said.

11       So it's a very -- it's a close mix between failure to have

12  substantiation and the right of the consumer to rely on the

13  statements.

14       The question is:  Do we have to prove that these claims

15  are false or misleading, or do we have to merely show that they

16  can't substantiate them, and did not have substantiation at the

17  time?

18            **THE COURT:**  I think we are sort of sliding into a

19  couple of different things.  I mean, as I listen to your

20  argument, I can understand an argument being made as to

21  reliance, and what would a reasonable consumer believe.  So

22  forth and so on.

23       But, I go back to what I thought is a question that's a

24  bit more fundamental, which is, as the lawsuit is structured,

25  are you saying that both types of situations -- one, lack of

1   substantiation, or two, willful or knowingly, a

2   misrepresentation as to the state of the science, if I can use

3   that term -- are essentially the same?

4       That is, that there's no legal -- that while you can

5   describe them differently, the legal effect is -- is -- is

6   irrelevant.  There is no legal difference between the two, in

7   terms of liability.  Because, Posner said, they fall in that

8   other category, and so they're actionable as well.

9           **MR. GARDNER:**  Absolutely, Your Honor.  And as I said,

10  I was only drawing the distinction to keep us out of the mine

11  field of whether or not merely fake -- making up something is

12  without any basis.

13          **THE COURT:**  Okay.  But if I walk in that mine field,

14  you would say that there are a number of things in that that

15  are claims here, that if it did make a difference -- which, you

16  don't think it does -- but if it did make a difference, those

17  claims would -- would be claims of lack of substantiation, as

18  distinct from lack of -- actual falsity in terms of the

19  evidence would be to the contrary.

20          **MR. GARDNER:**  Uh, we --

21          **THE COURT:**  I'm not trying to lead you to anything;

22  I'm just trying to make sure I understand it.

23          **MR. GARDNER:**  That is not the way we pled it.  We

24  pled it as deception.  But as the Court says, those are -- the

25  proof points are going to be the same.

1    They're a matter of whether we move forward with expert

2 opinions as to whether the claims the Defendants made are

3 substantiable, whether or not they are true, whether or not

4 they're misleading, and a little bit --

5        **THE COURT:**  I understand that.  Let me ask you

6 another question.  I want to go to a question on standing.

7 Seems to be the term *du jour.*

8    In order to have standing to bring -- to bring some of

9 these claims, you must plead that they relied on the misleading

10 website and print advertisements.

11    And what I understand your pleadings to demonstrate is

12 that these people have not alleged that they read or relied

13 upon the advertising of the websites.  To the contrary, what

14 they allege is that they relied on the labels.

15    Is that correct?

16        **MR. GARDNER:**  That's correct, Your Honor.  We're --

17 the point of bringing in the other advertising is twofold,

18 because this is brought as a putative class action.  Other

19 members of the class as we would seek to define it have seen

20 these practices.

21        **THE COURT:**  Well, but not any of the representative

22 members.

23        **MR. GARDNER:**  That -- the current Plaintiffs do not

24 allege they have seen the signs.

25        **THE COURT:**  Okay.

1          **MR. GARDNER:**  They saw the labels, Your Honor.

2          **THE COURT:**  Okay.  So —

3          **MR. ZALESIN:**  So —

4          **THE COURT:**  Do you want to make some comments?

5          **MR. ZALESIN:**  I would, with respect — let me start

6   with these two issues, Your Honor.

7       First, in terms of the lack-of-substantiation theory, I

8   think there is agreement among courts in California that a

9   private plaintiff has to do more than simply allege that the

10  proof upon which the Defendant is relying to substantiate its

11  advertising claims is insufficient; they have got to

12  affirmatively plead and prove falsity.

13      And, courts that have thought about this issue with care,

14  such as the Third Circuit in the *Richardson-Vicks — Sandoz*

15  *versus Richardson-Vicks* case, have very carefully analyzed the

16  distinction between a government body like the Federal Trade

17  Commission or the Food and Drug Administration, which has the

18  right to demand of any advertiser that it come forward with

19  substantiations for its claims, on the one hand, and a private

20  plaintiff suing under a federal competitor action under the

21  Lanham Act, or, as in this case, a state plaintiff suing under

22  the California UCL doesn't have the right to simply, without

23  any knowledge one way or the other or any evidence one way or

24  the other, to suggest that advertising is false, to file a

25  lawsuit and say, "Show me.  I'm curious; show me your

1   substantiation."

2        And these allegations are not of the sort Your Honor was

3   hypothesizing:  "This product will make you young," you know,

4   that it can't possibly be true, I don't -- burden shouldn't be

5   on a plaintiff to prove it false.

6        Take a look, for example, what they allege about the fiber

7   product (As read):

8                "There is no scientific consensus that refined fibers

9                function like intact fibers, and research on the

10               subject is inconclusive."

11       Now, those are their allegations.  That's not my

12   characterization.  Those are direct quotes out of Paragraphs 26

13   and 28 of the amended complaint.

14       So, they're coming in and saying, "Well, the scientific

15   community hasn't come to rest on this, but we want the Court to

16   makes the decision, and we want to be relieved of our burden of

17   proof to prove falsity, and place the burden on the

18   advertiser."

19       There is absolutely no support in the law, and we haven't

20   heard about a case.  We cited several cases in our brief,

21   including the *Scheuerman* case, versus Nestlé, and *Fraker versus*

22   *Bayer Corp.*, and there are others that speak to this

23   proposition.  So, it's an important distinction, and it's a

24   thread that runs through their entire case.

25       Second, with regard to the non-label advertising, the

1  websites and such, you know, the UCL creates standing for a

2  person who has lost money or property as a result of an

3  allegedly unfair or unlawful practice.

4      And, if you didn't -- if you were never exposed to, you

5  didn't see a particular advertisement, it follows inexorably

6  that you didn't lose property or money as a result of that

7  advertisement.

8          THE COURT:  Well, they say they can amend.  I don't

9  know --

10         MR. ZALESIN:  If they can find another plaintiff,

11  that's another story.  But we don't have a class action yet.

12  Right now, they have a putative class action with three

13  representatives, would-be class representatives.  And none of

14  them possesses the claim that's pleaded in the complaint.

15     So, those two issues are enormous problems for them,

16  before we even get to the preemption issue, which is frankly

17  where I was going to spend most of my time this morning.  And

18  I'd be happy to talk about that, or anything else that the

19  Court wishes --

20         THE COURT:  No, go ahead.

21         MR. ZALESIN:  Okay.  So, let me talk about preemption

22  a little bit, because this really guts, in my view, their

23  entire case.  And I want to focus my argument on the fiber

24  product, because if Your Honor was following the ECF filings

25  yesterday, the cat's now out of the bag.

```
 1        So, McNeil has discontinued, for reasons -- for business
 2   reasons I'll explain in a moment, these two products, the B
 3   Vitamins and the antioxidants products.
 4        And I'm happy to pass these up (Indicating),  if
 5   Your Honor want to look at the samples.
 6        (Items handed up to the Court)
 7           MR. ZALESIN:  As of January 1 of this year -- and
 8   this is now out in the public domain so we're not giving away
 9   any state secrets here -- those products, after roughly 18
10   months on the market, racked up a total of less than $1 million
11   in sales in the state of California, which wouldn't even get
12   you CAFA jurisdiction.  And the company's decided it doesn't
13   want to throw any more good money after bad, and those products
14   are discontinued.
15        So, let me focus on the fiber product, because I doubt
16   there's any point to litigating, and there may not be any
17   jurisdiction to litigate, other than the fiber product.
18        I'm sorry; did you have a question, Judge?
19           THE COURT:  No.  I was thinking these products would
20   have done rather well in Berkeley.
21           MR. ZALESIN:  Well, apparently our marketers failed
22   to tap into the right marketing strategy or the right
23   demographic, because they just didn't sell.
24           THE COURT:  Okay.
25           MR. ZALESIN:  I don't know why people didn't want to
```

1  get their vitamins in their morning coffee sweeteners, but

2  that's the way it went.

3        So, now, on the fiber product, we have, helpfully, a

4  decision by Mr. Gardner's favorite, Judge Posner.  It happens

5  to go right to the very heart of their claims in this case, the

6  Seventh Circuit's decision in *Turek versus General Mills*.

7        And so, let me step back and compare the claims in this

8  case to the claims in that case, and I think you'll see there

9  is really no way to get around the logic of this case.

10        So, what the Plaintiffs here allege is that this product

11  (Indicating) this fiber product which contains one gram of

12  fiber per packet, contains refined processed fiber, and that

13  this is different from naturally-occurring unprocessed fiber,

14  or "intact fiber," I think they call it in the complaint.

15        And, as I've read to you a moment ago, there's no

16  consensus in the scientific community as to equivalency, and

17  therefore, there's something deceptive or misleading about just

18  marketing this (Indicating) as having a gram of fiber, without

19  telling the consumer about that distinction.

20        And, that is virtually the identical claim that the

21  plaintiff made in that Seventh Circuit case, the *Turek* case.

22  There, the allegation specifically was that -- first of all,

23  the ad said "This product has 35 percent of your daily fiber,

24  that fiber is found in foods like beans and other legumes and

25  fruits and other products," very similar to what they say is

```
 1   implied by the fruit pictures here (Indicating), which are

 2   actually on every no-calorie sweetener, but so be it.

 3       And in fact, the product in the Turek case contained

 4   non-natural fibers, which have not been shown by current

 5   scientific evidence to possess all the benefits of natural

 6   fibers.

 7       The District Court looked at this, and said, "Hold on a

 8   second."  This is a nutrient-content claim governed by the

 9   National Labeling and Education Act, the NLEA.  The NLEA says

10   not only may you, but you must disclose the amount of fiber per

11   serving.  There is no requirement whatsoever under FDA

12   regulations that you tell the consumer what kind of fiber is in

13   the product.

14       In fact, FDA has a policy that it's reassessed several

15   times, and as recent as 2007 has come back and said, "No, we do

16   not want to divide the world of fiber into synthetic fiber on

17   the one hand and natural or intact fiber on the other hand.  We

18   are perfectly happy with the regulations the way they are.  We

19   are not going to impose that requirement."

20       And actually, CSPI, the pl- -- counsel, has on its website

21   statements to that effect.  That as far as our government is

22   concerned, fiber is fiber, and there's no distinction between

23   artificial or processed fiber and so-called intact fiber.

24       So, both the District Court and the Seventh Circuit in

25   that case said, "Look, the NLEA has a preemption clause," as
```

 1   Your Honor well knows.  That preemption clause says you can't

 2   impose any requirements that are not identical to the

 3   requirements of federal law.  You can't do that under state

 4   law.

 5         And, of course, "not identical to" has a broad definition.

 6   It means anything that's different from, or that directly or

 7   indirectly imposes a requirement that's not imposed by federal

 8   law.

 9         And the requirement at issue here would be a requirement

10   that we should have disclosed the kind of fiber there

11   (Indicating).  Now -- and that was preempted in that case, and

12   it should be here, too.

13         Now, we are very well aware, Your Honor, that we've had

14   two cases of similar factual situations, both of them involving

15   ConAgra.  First the *Lockwood* case, from 2009.  And then more

16   recently in December, the *Jones versus ConAgra* case.

17         And I'm actually very happy to be able to talk about those

18   two cases, because I think they very squarely frame in the

19   issue as to why this case -- you haven't seen a case like this,

20   where there really is preemption.

21         So, what happened in *Lockwood* --

22              **THE COURT:**  Well, your co-counsel in *ConAgra* would

23   not -- would not accede to that characterization.

24              **MR. ZALESIN:**  I'm sure they wouldn't.  But factually,

25   this case is quite distinct.

1          THE COURT:   Okay.

2          MR. ZALESIN:   So, this is -- I was lucky enough to

3    have this case on behalf of Coca-Cola against POM Wonderful in

4    the Ninth Circuit, where -- I'm lucky, I guess.  I have clients

5    that very scrupulously follow these FDA regs, and do only

6    exactly that which is permitted.  And there's no allegation,

7    even, on the other side, of a violation of FDA regs.

8          So in 2009, in *Lockwood*, you denied a motion to dismiss on

9    preemption grounds because the claim at issue (Indicating

10   quotation marks) was "natural," and you recognized at the

11   time -- and I think other courts have done the same since that

12   time -- that there's no FDA rule on "natural," and there's no

13   regulation, and therefore, it's not preempted.  There's nothing

14   to preempt.  Okay.  That's that case.

15         Now, fast-forward to 2012, this past December, in *Jones*.

16   And that's one of the many peer score false labeling cases that

17   are pending in this district.  And, all of those cases allege

18   that the defendant is violating specific provisions of the

19   Food, Drug and Cosmetic Act, or it's implementing regulations,

20   and that all the plaintiffs are trying do is impose identical

21   requirements under state law.

22         And there were antioxidant claims at issue in *Jones*, there

23   were nutrient-content claims at issue there, as well.  And

24   there were square violations of -- allegations of violations of

25   regs.  And Your Honor said "Not preempted," because they're

1  seeking to impose requirements identical to.

2      This is the perfect preemption case.  There's no

3  allegation of violation of any specific reg.  In fact, the regs

4  all authorize the statements in question that applies to fiber,

5  and we can go through the other two products as well, and they

6  concede that.

7      So, what is their argument?  The only argument they have

8  left is that the very broad sort of introductory provision in

9  the Food, Drug and Cosmetic Act, Section 403(a), which says

10  that a food is misbranded if its label is false or misleading

11  in any particular, that that broad language enables a private

12  plaintiff to bring a lawsuit under state law that parallels

13  that broad duty that you can't have anything false or

14  misleading in particular, even where the statements in

15  question, the challenged statements are heavily regulated, and

16  indeed, authorized, as they are in this case, by very specific

17  federal regs.

18      **THE COURT:**  To give the reading that the Plaintiffs

19  have given would essentially read out the preemption.

20      **MR. ZALESIN:**  Absolutely.  You could always bring a

21  case and say, "Well, I think it's false and misleading, and I

22  don't care if it complies with any of the other underlying or

23  more specific regs."

24      And every single court, except for one, which has been now

25  actually criticized for that decision -- not reversed, but

 1   criticized -- every single court that's considered that

 2   argument has rejected it.

 3        It was presented to the Ninth Circuit in the *Carrea versus*

 4   *Dreyer's* case, and it was presented to Judge Posner and the

 5   rest of the Seventh Circuit panel in the *Turek* case.  They

 6   didn't even dignify it with a response, because quite

 7   obviously, the more specific enactments control this more

 8   general enactment.

 9        So, this is a case of preemption that applies to the fiber

10   case --

11             **THE COURT:**  Is that true about all the other claims?

12             **MR. ZALESIN:**  It absolutely is.  The antioxidants,

13   it's even more specific.  There's four criteria for whether,

14   under FDA regs, whether you can make an antioxidant claim.  I

15   can go through them very, very quickly.

16        First, there has to be an RDI, a recommended daily intake

17   for the ingredient or the nutrient.  Second, the nutrient has

18   to have recognized antioxidant activity.  Third, the product

19   has to have 10 percent or more of that nutrient in the RDI.

20   And then fourth, the name of the nutrient has to be identified

21   on the product or linked by a symbol, for example, an

22   asterisk -- I'm reading just from the regs -- to the names.

23        And if you look at the antioxidant product, the

24   antioxidants are Vitamins C and E.  They are identified,

25   they're recognized.  They each have 20 percent of the RDI.

1  They're absolutely permitted by these regs.

2       And their arguments are, "Well, it's not so clear that

3  antioxidants really prevent disease, and consumers are confused

4  about that.  And, maybe these antioxidants in this product

5  aren't as good as the ones you get from fruits," which is

6  another position that is 180 degrees contrary to what the FDA

7  thinks.

8       The FDA says -- actually, if a manufacturer tried to say

9  that "We've" -- "Our antioxidants are better or our vitamins

10  are better because they're natural, and yours are synthetic,"

11  that product would be misbranded.  The FDA thinks there is

12  absolutely no difference between the two.  So, that's the

13  antioxidants product.

14       And then, very quickly, the B Vitamins product helps

15  support a healthy metabolism.  That is a classic FDA

16  structure/function claim.  The FDA has detailed guidance and

17  regulations on so-called structure/function claims.  There are

18  things like "help promote digestion," or "help support

19  cartilage and joint function," or "maintains healthy

20  circulation."

21       These are claims that the FDA has said can be made for

22  conventional foods, so long as there is evidence that, in fact,

23  the identified nutrient performs that -- supports that

24  structure/function relationship.

25       And again, just go to the CSPI website, and you will see

1  an admission that B Vitamins support a healthy metabolism.  Now

2  their argument on B Vitamins is, "Well, people -- because this

3  is a no-calorie sweetener, and because we're talking about

4  metabolism, people are going to assume that this product

5  somehow speeds up your metabolism and results in weight loss."

6       And, here is a situation where the FDA has actually said,

7  you know, "We know, we are aware, as the regulating agency,

8  that consumers may infer things from structure/function claims

9  that go beyond the truth.  'Help support a healthy immune

10  system,' some people may think that wards off colds.  But we

11  are prepared to authorize food manufacturers to make those

12  statements because we, as the regulating agency, need to strike

13  a balance between getting out valuable dietary information on

14  the one hand, and avoiding deceptive statements on the other

15  hand."

16       And, the FDA has made that policy determination with

17  respect to these sorts of structure/function claims.  And to go

18  against FDA on that would again implicate the preemption

19  statute, both explicit and implied.

20       So, we think all of these claims are squarely preempted,

21  and their 403(a) argument is a dead loser.

22            THE COURT:  Okay.  Would you address the preemption

23  argument?

24            MR. GARDNER:  Yes, sir.  Mr. Zalesin referred to --

25  and I wrote it down because it struck me -- the very broad

```
 1   introductory provision of 403(a).  I find that a little
 2   dismissive of the only federal law that is under review here.
 3        Everything else are technical regs, as to which --
 4            THE COURT:  What about preemption?  That's not -- is
 5   that a technical reg?
 6            MR. GARDNER:  The preemption?
 7            THE COURT:  Right.
 8            MR. GARDNER:  No.  The preemption, Your Honor, is as
 9   to very specific regs under -- in the -- pursuant to the Food,
10   Drug and Cosmetic Act, none of which are in play here.
11        If we were trying, as the plaintiffs in Turek were, to
12   force changes on the label, itself, giving the level of the
13   nutrient and a warning, which was the basis on which Judge
14   Posner said "No can do, you want to put a warning, and you want
15   to change the way FDA has said you disclose this nutrient," if
16   we were doing what Defendants say we're doing, we would be
17   probably preempted.
18        But, it's a Potemkin village.  We are not doing that.
19   They have constructed things that, were we to have done it, we
20   would lose.  But, we're not saying that.  We are merely saying
21   that the way this is presented on this label violates law.
22            THE COURT:  Isn't that sort of a convenient way of
23   dealing with the problem, that you would concede that it's
24   preemptive if you change the label, so you're not asking that
25   the label be changed; you're just asking that there be a whole
```

1  series of remedies under the state enforcement system which you

2  could never ask for if, in fact, it had been preempted, if you

3  had included a change of the label.

4      I mean, I don't know.  I'm looking at this thing, and it

5  looks like, sort of, whole two sets of enforcement regulations.

6  I mean, I'm not anti-regulation, but I think I'm anti-multiple

7  regulations.

8      If, in fact, one would concede that -- that had you asked

9  that it be regulated a particular way, say, "Oh, no, it can't

10 be, it's been preempted, and you can't do that," so you go

11 around and do it this other way, when the day is over, whenever

12 that day comes, when the day is over -- that didn't -- when the

13 day is over, you've got, you know, you've got the federal

14 government saying, "You don't have to do this," and you have

15 the state government saying, "Oh, yes, you do."

16     And, you know, that's -- that's an interesting scenario

17 when, in fact, you would concede that if you asked the federal

18 government to do it, they can't do it.  They've already said

19 they can't do it.  Or, they won't do it.  Or, they've taken an

20 opposite position.

21     I mean, it's just an odd, odd regulatory scheme.  I'm

22 trying to figure out what else would sort of -- where the

23 federal government says no, and the state government says yes,

24 and you're talking about a national product, I guess there are

25 examples of that.  But, I just am having a hard time -- you

1  know, I'm not in business, but I have to believe that we're

2  talking about a business.

3      I understand we're talking about the effects, the impact

4  of the business.  But you're talking about -- you're attacking

5  the business, the producer, the manufacturer, the distributor.

6  These people who are required to do certain things.  And, it's

7  just striking me as a bit odd.

8      In a situation in which it's conceded that if you ask the

9  federal government to do it -- agency to do it, they wouldn't

10  do it.  They don't have to do it.  And as a matter of fact,

11  they've rejected it.

12          **MR. GARDNER:**  The only way they've rejected that I

13  know of and that applies is the argument Mr. Zalesin is making

14  as to whether or not a particular phrasing as to immunity might

15  invoke a disease claim, whether "supports" versus "controls"

16  versus "regulates."

17      And there's discussion of that, but the only place I know

18  there's discussion is as to supplements, not as to regular

19  foods.  If, in their briefing, they've said, I've just missed

20  it.  If there is, I apologize.

21      Because, I'm not aware of the FDA taking an actual

22  position as to basically putting things that have a drug-like

23  effect into foods, which is what we're talking here.  The

24  supplement --

25          **MR. ZALESIN:**  Actually --

1       **THE COURT:**  That's an interesting case.  Does it

2   really make a difference?

3       One person's supplement is another person's food.  I know

4   people who live on supplements.  I'm –– I'm maybe one of them.

5   I haven't had a meal for quite a while.  I've had a lot of

6   supplements.

7       So the question is, is that right?  Is there this

8   distinction between supplements ––

9       **MR. ZALESIN:**  Actually, the FDA has said publicly, on

10  several occasions, that even before they issued their specific

11  regs on dietary supplements, they were of the view that these

12  types of structure/function claims were permissible for foods.

13      And the reason is, as is how the FDCA works, the

14  definition (Indicating quotation marks) of a drug is "an item

15  other than a food that affects the structure or function of the

16  body."  So, foods are exempted from the definition of a drug

17  under 201(g)(1)(C).

18      And, and add, the FDA has come out and said, "So,

19  everything we've said about dietary supplements, that applies

20  to conventional foods as well.  And actually, the bar is lower.

21  We don't have to go through a preclearance process, because

22  foods aren't even regulated in the same way that drugs or

23  dietary supplements are."

24      And we've pointed out the FDA guidance documents in our

25  brief, to that effect.

1          **MR. GARDNER:**  The difference being that these claims

2  -- we're not -- we have not alleged that these are

3  structure/function claims.  We have alleged that they are

4  disease-related claims.

5          The part of the definition of "drug" that Mr. Zalesin left

6  out is the main part, which is anything, foods or not, that

7  claim or can be read to claim -- and I'm quoting from memory --

8  to mitigate, prevent, treat, cure disease.  That applies to

9  everything.

10          If they had said, instead of "antioxidants," "will prevent

11  disease because of the antioxidants," we'd have an easy matter.

12  They couldn't.  They would be flatly illegal, subject to

13  seizure by state or federal authorities.

14          And, that gets me to the point the Court has raised, is:

15  Why is it fair that these people who did not -- are not

16  required to do business in California and chose to do business

17  here have to comply with state consumer protection and state

18  drug regulation laws?

19          It's part of the laboratories of democracy.  Congress

20  recognized it.  Congress was careful to have only very, very,

21  very specific preemption language.  It doesn't preempt anything

22  to do with claims on foods.

23          The language preempts if we were trying to make a claim

24  about the label and the disclosure on the label, as the *Turek*

25  plaintiffs were, of a nutrient content -- the nutrient content

1  of the product.

2      It does not mean that they can meet these minutiae, and

3  they can find a relatively complacent FDA that does not often

4  take action, and say, "Well, we don't have to," on the state

5  laws.

6      There's a very long history in the Supreme Court of all

7  but praising the dual regulation of food and drug laws.  There

8  are several opinions, let's see, at least one out of this

9  Court, I can bring to the Court's attention -- out of the Ninth

10  Circuit, rather -- that show that --

11           **THE COURT:**  I'm not being critical of the dual

12  regulation.

13      What I'm saying is that where one entity has spoken, and

14  has considered and rejected a particular requirement, it seems

15  to me odd that the -- that the state regulators in the

16  laboratory of democracy can go ahead and require it, unless

17  it's pretty clear that the -- that there is no preemption,

18  whatsoever, in -- I mean, look.

19      You want laboratories of democracy, a state laboratory;

20  just do away with the preemption doctrine.  Then everybody goes

21  and does what they want do; there's no problem at all.

22      Well, maybe the federal government's interesting, what

23  they have to say; maybe not.  Who cares?  California's

24  condition:  It's my way or the highway.  I mean, California can

25  do as they want to do.  And, that comes up in a lot of

1   different contexts.  I've seen it many times.  Maybe that makes

2   a lot of sense.

3        But, that's not this case.  This case, there is a

4   preemption doctrine.  This case -- the preemption doctrine

5   actually is always of concern to a federal court.  It ought to

6   be a concern to any court.  But, it's a concern.

7        Well, anyway, I think I have the arguments in mind.

8             **MR. ZALESIN:**  If I could just make one other point,

9   Your Honor?

10            **THE COURT:**  Yeah.

11            **MR. ZALESIN:**  On the -- you're absolutely right that

12  where you have a preemption statute, the fact that legislators

13  or regulators in California might want to go further, it

14  doesn't matter.  Congress has spoken, and the law is what it

15  is.

16       And the laboratory of democracy that is left for the

17  Plaintiffs, CSPI, is to lobby the FDA to get it to change its

18  rules.  And they certainly know how to do that.

19       But, as to this whole federalism issue, California,

20  itself, has its own -- forgetting about federal preemption,

21  California has a safe-harbor doctrine handed down by the

22  California Supreme Court that says that conduct that is

23  expressly permitted by government authority cannot be a

24  violation of the UCL.  It's just -- we don't want to go that

25  far with court regulation of business conduct.

1        And that's the *Cel-Tech* case, from the California Supreme

2  Court.

3            **THE COURT:**  No, but my statement -- if it's

4  preempted, then the safe-harbor doctrine is moot.  Right?

5            **MR. ZALESIN:**  Absolutely.  But, I'm simply making the

6  point that even the California state interests have been

7  manifested under state law.

8            **THE COURT:**  I understand.

9            **MR. ZALESIN:**  Gotcha.

10           **MR. GARDNER:**  One point, Your Honor?

11           **THE COURT:**  Sure.

12           **MR. GARDNER:**  To clarify, again on the preemption, we

13  direct the Court to the very few portions of the law that say

14  what -- and it refers to, like, nutrient content claim regs and

15  rules.  Only those are preempted, when the NLEA was passed, and

16  it's not --

17           **THE COURT:**  You say it doesn't apply to these.

18           **MR. GARDNER:**  It said nothing.  There's nothing

19  preemptive outside of this.  It restated the decades of happy,

20  sometimes conflicting enforcement of food and drug laws by

21  state food and drug officials, and by consumers.

22           **THE COURT:**  Okay.  Thank you very much.

23           **MR. GARDNER:**  Thank Your Honor.

24           **MR. ZALESIN:**  Your Honor --

25           **THE COURT:**  I'll give your boxes back (Indicating).

1          **MR. ZALESIN:**  I was going to offer you the two that

2     you don't yet have (Indicating).

3          **THE COURT:**  Well, we'll use them as exhibits, and

4     return them at the end of the --

5          **MR. ZALESIN:**  Take the fiber and the regular Splenda,

6     and you'll have a complete collection.

7          **MR. GARDNER:**  Some of which may be of value on eBay.

8          **THE COURT:**  You never know.  I won't be posting it on

9     eBay, at least under my name.

10          **MR. GARDNER:**  Thank you.

11          **MR. ZALESIN:**  Thank you very much, Your Honor.

12     (Conclusion of Proceedings)

13

14

15

16

17

18

19

20

21

22

23

24

25

**<u>CERTIFICATE OF REPORTER</u>**

     I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

<u>/s/  Belle Ball</u>

     Wednesday, May 1, 2013

     Belle Ball, CSR 8785, CRR, RDR